452 S.E.2d 886

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Gail B. STUART, Jr., Defendant Below, Appellant.**

No. 22033.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Dec. 8, 1994.

Silas B. Taylor, Sr. Deputy Atty. Gen., David A. Pinkowitz, Third-year law student, Charleston, for appellee.

Linda M. Gutsell, Spilman, Thomas & Battle, Morgantown, for appellant.

CLECKLEY, Justice:

The appellant and defendant below, Gail B. Stuart, Jr., appeals the final order of the Circuit Court of Monongalia County dated May 11, 1993, that sentenced him to serve six months and one day in jail and ordered him to pay a $1,000 fine and court costs for his conviction of second-offense driving under the influence. The final order also denied the defendant's motion for a new trial, but stayed the execution of the sentence pending this appeal.

On appeal, the defendant makes two assignments of error. First, the defendant asserts he was denied his constitutional right to due process by the State's failure to preserve and produce an audiotape and a videotape which may have contained exculpatory evidence. Second, the defendant claims the trial court committed reversible error by failing to apply the proper standard to determine if his vehicle was lawfully stopped.

## I.

## FACTS

At approximately 12:46 a.m. on Sunday, April 26, 1992, an anonymous person called 911 and reached the Monongalia Emergency Centralized Communications Agency (MECCA). According to the defendant's brief, the caller reported to the 911 operator that a drunk driver " 'pulled into the Sabraton McDonald's. (Pause) He was driving all over the road very erratically and going the wrong direction on the road.' " [1] Determining that the area of the alleged drunk driving was within the jurisdiction of the Morgantown Police Department (MPD), the 911 operator transferred the call to the MPD dispatcher. The MPD dispatcher spoke with the caller. Subsequently, two police officers, Officer Roy Zinn and Officer Gregory Brumdage, were sent to the area. Unfortunately, the audiotape of the conversation between the caller and the MPD dispatcher was erased prior to the trial.[2]

Officer Zinn testified he was in the MPD dispatch area when the call was transferred from 911. Officer Zinn stated the dispatcher told him that the caller reported a drunk driver in the Sabraton area driving a red Mercury Grand Marquis with a West Virginia license plate of 1FG–953. Officer Zinn then went to the area.

---

1. The 911 call to the MECCA was recorded and available at the bench trial. The record indicates this audiotape was played to the trial court, but it was not transcribed or admitted into evidence.

2. The State claims the audiotape was erased pursuant to a MPD policy to reuse tapes after thirty days.

Officer Brumdage also testified the dispatcher gave him a detailed description of the vehicle over the radio, including its color, model, and license plate number. Officer Brumdage stated that he was dispatched at 1:01 a.m.; and, at the time he was dispatched, he was only a little over one-half mile away from the Sabraton area. Officer Brumdage said he was behind Officer Zinn when they saw the defendant driving a vehicle that matched the description they were given by the dispatcher.

Officer Zinn said the defendant passed by them going in the opposite direction so they made a U-turn and followed him. As the police officers followed the defendant, Officer Brumdage paced the defendant's speed at approximately 25 miles per hour. Both officers noted for the record that the road in this area is level and straight and the posted speed limit is 35 miles per hour. Officer Zinn testified that one of the "detection clues" of the behavior of a drunk driver is a vehicle moving at a slow speed. Officer Zinn also said he believed he should check into the situation based upon the defendant's slow driving, the time of day, and the day of the week. Likewise, Officer Brumdage told the trial court that even if he had just been driving down the road on his way to town, the circumstances would have caught his attention and led him to investigate the defendant. Both police officers testified that they followed the defendant approximately 200 to 300 yards before the decision was made to stop him.[3]

After the defendant was stopped, the police officers approached his vehicle; and the defendant was asked to produce his driver's license, registration, and proof of insurance. Both police officers said the defendant had a strong smell of alcohol. Consequently, the defendant was asked to perform and failed a field sobriety test. He was placed under arrest and was taken to the police station where he was given a breath test. The results of the test indicated the defendant's blood alcohol content to be .215. The defen-

dant does not challenge the accuracy of the test.

The defendant disputes the events leading up to his stop and subsequent arrest. The defendant testified he was not the person who stopped at the McDonald's restaurant as indicated by the anonymous caller. The defendant stated he stopped at a Subway sandwich shop in Sabraton and got a sandwich that was found in his vehicle when it was inventoried by the police. He contends he left the Subway shop and noticed a police cruiser going in the opposite direction. He slowed down and then observed a cruiser behind him and a second cruiser pulled up beside him.

The actual events of the stop were videotaped by a camera in Officer Zinn's car. The videotape was viewed at a previous hearing in magistrate court; however, it was erased prior to the proceedings before the trial court.[4] On cross-examination of Officer Brumdage, defense counsel suggested to the trial court that the time appearing on the videotape showed the cruiser pulling behind the defendant at approximately 12:55:02 a.m. and the defendant stopping at 12:55:31.

A few days after his arrest, the defendant served a "REQUEST FOR DISCOVERY" upon the Monongalia County Prosecuting Attorney. In paragraph six of the request, the defendant asked for "[a] copy of the incoming calls and dispatch logs for the period from 9:00 p.m. on April 25, 1992, until 2:00 a.m. on April 26, 1992, as well as any electronic recording of such calls." The State responded to the request on May 20, 1992, but only included "a copy of the D.W.I. Information Sheet ... [and] material relating to the defendant's prior DUI conviction[.]" According to the defendant's brief, the State agreed to supplement its discovery with the recording of the anonymous call. However, a few days later, the Prosecuting Attorney's Office advised the defendant that the audiotape of the call to the MECCA would be provided, but

---

3. The accounts of the events that occurred when the police officers attempted to pull the defendant over conflict and are irrelevant to the question of whether the police officers had sufficient grounds to stop the defendant.

4. The State notes in its brief that no explanation was sought or given for erasing the videotape.

the audiotape of the transfer to the MPD dispatch was destroyed.

At the conclusion of the bench trial, the trial judge [5] said it was his "judgment that the officers cannot rely on a statement made from a dispatcher based on an anonymous caller who has no track record with the police department and, indeed, whose name is not even named or no information about him whatever is relayed to the officers." The trial judge indicated he only would consider the anonymous call as having "the effect of putting the officers on the scene." The trial court then determined the officers had reasonable suspicion to make the stop by finding: (1) "[T]he area where the car was traveling ... is generally open and one would expect the flow of traffic to be right at the speed limit"; (2) The car was "traveling along at a speed considerably below that of what is the normal flow of traffic"; and (3) "[M]ost importantly, we have it at 1:00 A.M. at night."

## II.

## DISCUSSION

To decide this case, we initially must address two issues. The first issue is whether police officers need reasonable suspicion or probable cause to make an investigatory stop of a vehicle. The defendant argues the police officers needed probable cause to stop him. We disagree. We find under cases decided by the United States Supreme Court that police officers only need reasonable suspicion to make an investigatory stop. The second issue is whether police officers can rely upon an anonymous tip to establish reasonable suspicion and, if so, what weight the tip should be given. For the reasons set forth in this opinion, we hold that police officers may rely upon an anonymous tip if it is corroborated by independent police work and, thereby, sufficiently establishes reasonable suspicion.

In *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979), the Supreme Court said that to stop a vehicle and detain the driver to check the driver's license and the vehicle's registration violates the Fourth Amendment unless "there is at least [an] articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law[.]" Similarly, in *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984), the Supreme Court stated that under the Fourth Amendment a police officer who does not have probable cause may briefly detain an individual to investigate a suspicion provided the officer's " 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime[.]" *Quoting United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617 (1975).[6]

Contrary, in *State v. Meadows*, 170 W.Va. 191, 193, 292 S.E.2d 50, 52 (1982), we stated "[t]he Fourth Amendment requires that a car cannot be stopped without probable cause." (Citations omitted). In note 2 of *Meadows*, 170 W.Va. at 194, 292 S.E.2d at 53, we cited *Brignoni–Ponce* and other related Supreme Court cases as recognizing there are limited circumstances that do not require probable cause. Nevertheless, we concluded in note 2 that there was insufficient evidence even under the reasonable-suspicion standard to support stopping the vehicle in the case. Although we acknowledged its application in limited circumstances, we did not adopt the reasonable-suspicion standard in *Meadows*, and, in fact, we applied a probable-cause standard in the text of the opinion. We now conclude the proper standard to be applied in this and similar cases is reasonable suspicion. Thus, police officers may stop a vehicle to investigate if they have an articulable reason-

---

5. Although the Honorable Larry V. Starcher signed the final order in this case, the Honorable W. Robert Abbot presided as the trial judge.

6. In *Brignoni–Ponce*, the Supreme Court applied the reasonable suspicion standard for vehicle stops by roving border patrols. The Supreme Court stated "a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference." 422 U.S. at 883, 95 S.Ct. at 2581, 45 L.Ed.2d at 617.

able suspicion that the vehicle is subject to seizure or a person in the vehicle "has committed, is committing, or is about to commit a crime[.]" 468 U.S. at 439, 104 S.Ct. at 3150, 82 L.Ed.2d at 334. To the extent *State v. Meadows* holds otherwise, it is overruled.[7]

More recently, the Supreme Court in *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), addressed the reasonable-suspicion standard in the context of stopping a vehicle upon information ascertained, in part, by an anonymous tip. In *White,* the police received an anonymous telephone tip in which the caller told the police the defendant would be leaving a specific address at a specific time "in a brown Plymouth station wagon with the right taillight lens broken[.]" The caller also informed the police the defendant would be traveling to Dobey's Motel and "would be in possession of ... cocaine inside a brown attache case." 496 U.S. at 327, 110 S.Ct. at 2414, 110 L.Ed.2d at 306–07.

The police went to the address provided by the anonymous caller and watched the defendant leave the building and get into the station wagon as described by the caller. However, the defendant was not carrying an attache case. The police followed the defendant who drove directly towards Dobey's Motel. The police stopped the defendant shortly before she reached the motel. Upon a search of the car, the police found a brown attache case which was locked. The defendant provided the police with the combination to unlock the attache case; and, upon unlocking it, the police found marijuana. At the police station, cocaine was found in the defendant's purse.

■ In determining that the police had sufficient information to make the stop, the Supreme Court put the case in the context of a stop under *Terry v. Ohio,* 392 U.S. 1, 88

S.Ct. 1868, 20 L.Ed.2d 889 (1968), and applied a reasonable-suspicion standard.[8] The Supreme Court characterized reasonable suspicion as

"a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309.

The Supreme Court then went on to state that when evaluating whether or not particular facts establish reasonable suspicion, one must examine the " 'totality of the circumstances,' " which includes both the "quantity and quality" of the information known by the police. 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309, *quoting United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d at 621, 629 (1981). "Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309.

The Supreme Court in *White* applied the totality of the circumstances test, as it did in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), with the only difference being *Gates* considered an anonymous tip in a probable-cause context. Although not everything the anonymous caller said in *White* proved true, the Supreme Court found the caller did accurately indicate the location of the building the defendant would be leaving, the type and description of the car the defendant would be driving, the time frame the defendant would depart, and

---

7. *Cf. State v. Choat,* 178 W.Va. 607, 611, 363 S.E.2d 493, 497 (1987) (where this Court said in a stop and frisk situation of an individual "[a] brief investigative stop is ... permissible whenever the police officer has a reasonable suspicion grounded in specific and articulable facts that the person he stopped has been or is about to be involved in a crime"). (Citations omitted).

8. In *Terry,* the Supreme Court said "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906–07.

the destination of the defendant.[9] Under the totality of the circumstances approach, the Supreme Court considered the police officers' personal observations of the facts and the weight the anonymous tip should be given "in light of its indicia of reliability as established through independent police work." 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309. Applying these considerations to the facts of *White*, the Supreme Court determined the anonymous tip was sufficiently corroborated to justify the stop.

 The present case is slightly different than *White* in the sense that it contains the additional problem of the destruction of the audiotape to the MPD and the videotape of the stop. In response to this problem, the defendant filed a "MOTION TO EXCLUDE TESTIMONY" in the trial court to prevent the State's witnesses from recounting information of the anonymous call contained on the destroyed audiotape to the MPD. The trial court permitted the testimony. On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994) (discussing at length the standard of review in a suppression determination). *See also United States v. Rusher*, 966 F.2d 868, 873 (4th Cir.), *cert. denied*, ── U.S. ──, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference. *See generally*

*Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985). In fact, we should not reverse a trier of fact on a question of credibility when the trier of fact had the advantage of hearing the testimony.

 Although the trial court permitted testimony with regard to the MPD audiotape, the trial court stated it would not consider the anonymous call in determining whether or not the police officers had reasonable suspicion to stop the defendant. The trial court said the effect of the call was only to put the police officers on the scene, and it could not be used to justify whether the police officers had reasonable suspicion to make an investigatory stop. Nevertheless, even without the anonymous call, the trial court concluded the police officers had sufficient reasonable suspicion to stop the defendant based upon the defendant's driving 25 miles per hour in a 35 miles per hour zone on a relatively straight road at 1:00 a.m.

 We disagree with the trial court's legal conclusion for two reasons. First, the purely innocuous facts mentioned by the trial court, without more, clearly are insufficient to establish reasonable suspicion to stop the defendant.[10] Second, under *White, supra*, the trial court should have considered the anonymous call in combination with the independent police work performed. Considering the anonymous call in conjunction with the other facts, we find the anonymous call was corroborated sufficiently to give it an indicia of reliability.[11] Specifically, the anon-

9. The defendant actually was stopped just prior to her reaching the motel. In spite of this fact, the Supreme Court found the defendant's destination was "significantly corroborated" given that the defendant drove "the most direct route possible to Dobey's Motel ... [which] involved several turns[.]" 496 U.S. at 331, 110 S.Ct. at 2414, 110 L.Ed.2d at 309–10.

10. Although "[reasonable] suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence," *see United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989), the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution nevertheless require that the police articulate facts which provide some minimal, objective justification for the stop. Specifically, in *Sokolow*, the

Court stated: "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."' ... The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10. (Citations omitted). The criteria for reasonable suspicion to stop a vehicle are very similar to a street stop under *Terry*. Factors such as erratic or evasive driving, the appearance of the vehicle or its occupants, the area where the erratic or evasive driving takes place, and the experience of the police officers are significant in determining reasonable suspicion.

11. We make clear that before an anonymous source of information may be used by the investigating officer, the information must meet the

ymous caller allegedly reported to the MPD dispatcher that a drunk driver was in the Sabraton area driving a red Mercury Grand Marquis with a West Virginia license plate of 1FG–953. When the police officers arrived on the scene, they found the defendant driving the car described by the caller traveling at an unusually slow speed given the road conditions. Thus, given the totality of the circumstances, the anonymous call, and the police officers' observations once they arrived on the scene, we conclude the police officers did have sufficient reasonable suspicion to stop the defendant to make a further investigation.[12]

The defendant complains, however, that not everything the anonymous caller told the MECCA operator indicated he was the drunk driver. As previously mentioned, the audiotape of the 911 call to the MECCA was preserved and played at the bench trial; [13] however, the audiotape of the transferred call to the MPD was destroyed. The defendant asserts that if the same information contained on the MECCA audiotape was relayed to the MPD dispatcher, the MPD audiotape would have been exculpatory.

The defendant primarily alleges that there are two exculpatory inconsistencies between what the anonymous caller told the MECCA operator and what he states actually occurred. First, the caller reported to the MECCA operator that a drunk driver pulled into a McDonald's restaurant. The defendant contends he stopped at a Subway sandwich shop. Second, the caller told the MECCA operator the drunk driver was driving erratically and in the wrong direction. The defendant claims such behavior was not observed by the police officers when he was stopped.[14]

On review, even if we assume all the facts the defendant complains about were relayed to the MPD dispatcher, we find they still are insufficient to be considered exculpatory in light of the other information given to the MPD dispatcher by the anonymous caller, namely the exact make, model, and license plate number of the defendant's car. The defendant argues that without the audiotape, however, he could not adequately verify or cross-examine the police officers with regard to the description of the defendant's car they allegedly were given by the dispatcher.[15] We disagree with the defendant and find his defense was not hampered in this respect.

To refute the police officers' recollections, the defendant could have called the MPD

standard of reliability. Thus, an anonymous tip alone does not have the necessary indicia of reliability to meet the reasonable-suspicion standard. With proper corroboration or other factors indicating the accuracy of the tip, however, the fact the information is received anonymously does not preclude a finding that reasonable suspicion exists under the totality of the circumstances. *See Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (where the Supreme Court made clear that the information justifying an investigative stop can be derived from sources of information, such as an informant's tip). The bottom line is that, under the totality of the circumstances, the information relied upon by the officer must be sufficient to meet the *Terry* standard: specific and articulable facts creating a reasonable suspicion of criminal activity. In the case at bar, the information supplied by the anonymous caller was just one factor among many supporting a reasonable and articulable suspicion that the defendant was engaged in criminal activity. *See, e.g., United States v. Ocampo,* 890 F.2d 1363 (7th Cir.1989).

**12.** In his brief, the defendant confuses what standard a police officer should use to make an investigatory stop with whether a complaint meets the probable-cause requirements of Rule 5(a) of the West Virginia Rules of Criminal Procedure. Rule 5(a) provides, in part: "If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) [of the West Virginia Rules of Criminal Procedure] with respect to the showing of probable cause." Here, the complaint met the probable-cause requirement as the officer included in the complaint that the defendant smelled of alcohol and failed his field sobriety test.

**13.** *See* note 1, *supra.*

**14.** In addition, the defendant asserts that the facts suggest he would have traveled well beyond the point at which he was pulled over given the time of the call, the speed he was traveling, and the time he was stopped. We find the time-frame issue insignificant in that we do not know and none of the tapes would provide us with information as to what occurred between the time the anonymous call was made and the time the police officers arrived on the scene.

**15.** Apparently, the description of the car was not contained on the audiotape to the MECCA.

 

dispatcher to testify as to whether the anonymous caller gave the dispatcher a detailed description of the defendant's car. By not calling the dispatcher to testify, the defendant effectively waived his right to argue that information the police officers said they received from the dispatcher was inaccurate. Therefore, for the foregoing reasons, as the Supreme Court did in *White, supra,* we conclude under the totality of the circumstances that, although not all the information provided by the anonymous caller was verified, the anonymous call as corroborated by the subsequent police work created a reasonable suspicion to justify an investigatory stop.[16]

## III.

## CONCLUSION

In sum, we conclude that for a police officer to make an investigatory stop of a vehicle the officer must have an articulable reasonable suspicion that a crime has been committed, is being committed, or is about to be committed. In making such an evaluation, a police officer may rely upon an anonymous call if subsequent police work or other facts support its reliability and, thereby, it is sufficiently corroborated to justify the investigatory stop under the reasonable-suspicion standard.

Applying these principles to the present case, we find the trial court clearly erred in determining the anonymous call could not be used to justify the stop and in deciding the evidence was sufficient without the anonymous call to establish reasonable suspicion. However, when we consider the anonymous call in conjunction with the subsequent police work, we conclude there was sufficient evidence to establish reasonable suspicion to make an investigatory stop of the defendant.

Therefore, the order of the Circuit Court of Monongalia County is affirmed.

Affirmed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

**16.** We find the defendant also waived his right to argue the videotape was destroyed in bad faith. Once he discovered the videotape was destroyed, the defendant did not present any evidence or request additional time to gather any evidence as to why the videotape was destroyed. In addition, the defendant did not ask the trial court for any relief, such as a mistrial, due to the videotape's destruction.

We also find the defendant waived his right to argue the videotape was exculpatory. The pre-

sentation of his defense was not frustrated by the videotape's destruction. In fact, defense counsel viewed the videotape at a previous hearing in magistrate court and could have taken the stand and testified as to its contents.

We do caution police departments in the future to be more careful in the preservation of its audiotapes and videotapes when they are relevant to impending and pending cases.