702 S.E.2d 276

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Mark GILMAN, Defendant Below, Appellant.**

No. 35297.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 7, 2010.

Decided Oct. 18, 2010.

Susan J. Van Zant, Esq., Williamson, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Esq., Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

This case is before the Court upon the appeal of Mark Gilman from the September 14, 2009, final sentencing Order entered by the Circuit Court of Logan County, West Virginia. The Appellant was sentenced to a term of forty years in the West Virginia State Penitentiary after being convicted by a jury of second degree murder,[1] arising from the death of Mary Pelfry. On appeal, the Appellant argues that: 1) the circuit court erred in not suppressing the Appellant's statement given to the police; 2) the evidence presented at trial did not support his conviction of second degree murder;[2] 3) the circuit court erred in the jury selection; and 4) the Appellant was denied due process of law by the prosecuting attorney's misleading comments to the jury. Upon review of the parties' briefs and arguments, the record, and all other matters submitted before the Court, the decision of the circuit court is hereby affirmed.

## I. Procedural and Factual Background

On January 5, 2006, the charred remains of Mary Pelfry were discovered by Barney Lee Shepard and his brother, Bill Lucas, in an area of Logan County, West Virginia, called Pine Creek. The victim's body was covered with straw and tin. Other than the victim's legs, her body was unrecognizable. Upon finding the body, the two men drove to a gas station in Omar, West Virginia, and called the West Virginia State Police. State troopers were dispatched to the location where they met Mr. Shepard and accompanied him to the crime scene. Upon returning to the location of the body, Mr. Shepard noted that someone had re-covered the body with more straw and placed an old grill and a piece of tin on top of the body.

An autopsy revealed that the victim had been struck three times on the left side of the head with a blunt object. According to

---

1. The jury convicted the Appellant on July 31, 2008. There were several delays at the trial court level before the appeal was filed with the Court.

2. The Appellant's first two assignments of error concern the sufficiency of the evidence and, therefore, are consolidated for the purposes of appeal.

the medical examiner, the first blow to the head was sufficient to kill Ms. Pelfry. The medical examiner further testified that the body was completely burned. Ms. Pelfry was identified by the fingerprint of the fourth digit of her right hand.

As part of the investigation, Troopers C.R. Holbert, J.J. Lester, and Boone County Sheriff Chad Barker were sent to canvas the area near the crime scene. The Appellant resided on the property closest to the crime scene. The officers saw the Appellant standing in his driveway. Trooper Holbert testified that he approached the Appellant and asked him if he had seen anything unusual coming up or down the road in the last couple of days. The Appellant responded by saying, "Well, you guys are here for the burnt girl." None of the officers had told the Appellant why they were there. Additionally, Trooper Holbert and Deputy Barker noticed two large five or six gallon gas cans sitting in the middle of the driveway. The Appellant also told the officers that he had not been off the property that day. The officers asked him about tire tracks going off the property and up the road towards the crime scene and the Appellant admitted that he had left the property. Deputy Barker further testified that he saw straw at the Appellant's home. The officers did not take a statement from the Appellant at that time.

Later that night, the Appellant voluntarily accompanied state police officers to the Logan detachment of the West Virginia State Police. Trooper A.S. Perdue read the Appellant his *Miranda*[3] rights. Trooper Perdue testified that he told the Appellant that he was not under arrest and was free to leave at any time. Trooper Perdue's interview of the Appellant lasted approximately twenty minutes. The Appellant gave inconsistent answers to the questions posed by Trooper Perdue. For instance, the trooper testified that first the Appellant denied that he had been to Pine Creek where the victim's body

was located. Then the Appellant stated that he had been there. Additionally, Trooper Perdue testified that the Appellant stated that he had never taken straw to the crime scene.[4] According to Trooper Perdue, the Appellant also put his head down and stated "I did it, I did it," two times. When Trooper Perdue asked the Appellant what he had done, the Appellant raised his head and said "I didn't do anything." When asked again, the Appellant said "I'm half and half." Trooper Perdue testified that the only way he could interpret that statement was that the Appellant was saying he was half guilty and half not guilty of the victim's murder. The Appellant then told the officer that he needed "some time to think about this," and left the detachment.

On January 10, 2006, the Appellant returned to the Logan detachment of the West Virginia State Police on his own volition to recover two knives that had been confiscated by the police when he had been transported and interviewed previously on January 5, 2010. While the Appellant was there, he was interviewed by West Virginia State Police Sergeant Christopher Casto.[5] Before this interview occurred, the Appellant again was *Mirandized*. Because the Appellant could not read, the officer went through each of the Appellant's rights orally line-by-line, then had the Appellant initial each line. The form provided that the officer wanted to question the Appellant about a homicide, that the Appellant was not under arrest, and that the Appellant was free to leave at any time. After going over the Appellant's rights with him, the Appellant voluntarily executed a waiver.

During the questioning of the Appellant, he denied knowing anything about the crime scene. Sgt. Casto testified that the Appellant then stated that he could not recall if he saw the victim's body. Upon further questioning, he told the officer that he saw the victim's body covered with a piece of tin and

3. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. The Appellant, in his subsequent confession, said that he had covered the victim's body with straw and tin.

5. Sgt. Casto was called to the Logan detachment to administer a polygraph exam to the Appellant. There are no assignments of error raised in conjunction with the administration of the polygraph or the results of the polygraph as the polygraph results were not admitted in evidence.

straw. The Appellant then told the officer that he had been invited to a party with three unknown men and the victim, Ms. Pelfry, at Pine Creek. The Appellant stated that he had been drinking beer with them and he thought that they had put something in his beer that made him pass out. He stated that when he came to, Ms. Pelfry was lying there. The Appellant then asked the officer if he was going to be arrested and Sgt. Casto told him that he was not going to arrest him, as that decision was made by the investigating officer and he had no control over it. At this time, the Appellant asked Sgt. Casto to get him a lawyer. The officer told the Appellant that he could not get him a lawyer, because he had not been charged with a crime, was not under arrest, and was not entitled to court-appointed counsel. Sgt. Casto further testified that he told the Appellant that he could use the phone to call an attorney. The officer told the Appellant that the interview was over and then got up to leave the room. Before the officer got to the door of the room, the Appellant stated that he still wanted to talk, but that he wanted to talk to Trooper Vance.[6] Sgt. Casto testified that the time that elapsed between the Appellant asking for a lawyer, then stating that he wanted to talk to Trooper Vance was less than a minute.

Trooper Vance then interviewed the Appellant. The officer testified that he did not *Mirandize* the Appellant again as he was advised prior to obtaining any statement from the Appellant that the Appellant had been given his *Miranda* warnings. Sgt. Casto did not tell Trooper Vance about the Appellant's request for a lawyer; however, the Appellant never asked Trooper Vance for an attorney. Trooper Vance testified that he went over the Appellant's statement with him several times before committing it to writing. He further stated that the Appellant was cooperative and did not appear to be under the influence of any drugs or alcohol. According to Trooper Vance, the Appellant understood the questions he asked and responded accordingly. The Appellant never

told the officer he was tired and the Appellant was given something to eat and drink.

The Appellant told Trooper Vance that he had picked up Ms. Pelfry at a gas station and that they had gone to Pine Creek to engage in sex. Once they arrived, Ms. Pelfry asked the Appellant to take off his clothes. As he started taking his clothes off, Ms. Pelfry began laughing. The Appellant asked her why she was laughing and she told him that it was none of his business. The Appellant stated that that is when he got mad and "lost it." He stated that he slapped the victim and she said to the Appellant, " 'That didn't hurt,' like she was tough or something." So, the Appellant stated that he picked up a stick and hit her in the face four or five times until she fell. The Appellant checked to see if she was dead and got scared. He stated that he left Pine Creek and went to his house and "collected ... [his] thoughts." The Appellant stated that he returned to the scene an hour or two later. He then poured gas on the victim's body and her clothes and put straw over the body. He set the victim's body on fire. The Appellant stated that he left the crime scene again only to return an hour or two later to see if the victim was burnt. Because the victim's body had not burned completely, the Appellant tried to cover the body with straw and a piece of tin. He then left the crime scene.

During the trial, the Appellant moved for a judgment of acquittal at the close of the Appellee's case, arguing that the State had failed to prove any involvement of the Appellant with Ms. Pelfry's murder. The trial court denied the motion.

The Appellant's case consisted of trying to convince the jury that his confession was false. To that end, the Appellant tried to show that, given his low IQ and psychological profile, he was more prone to give a false confession when under pressure. The Appellant denied knowing Ms. Pelfry, let alone killing her. The Appellant also testified that nothing in the statement that he gave to Trooper Vance was true. The Appellant offered Dr. Robert Miller, an expert forensic

6. According to the testimony, the Appellant had been arrested for a different crime by Trooper Vance prior to the instant matter. Trooper

Vance testified that during the prior arrest he had established some sort of rapport with the Appellant.

psychiatrist, who testified that he had evaluated the Appellant on November 13, 2006. Dr. Miller stated that there are twenty-five variables and factors associated with persons prone to making false confessions. Of these twenty-five factors, Dr. Miller opined that the Appellant had fourteen at the time of his confession. These factors included sleep deprivation, marijuana use, and an IQ of 83. Dr. Miller described the Appellant as being submissive to authority. However, Dr. Miller relied almost entirely on the Appellant's self-reporting in forming his opinion.[7]

The Appellant also introduced evidence that he was not with Ms. Pelfry when her death occurred. Various family members and friends testified that the Appellant was with friends and family members at his brother's house on December 31, 2005, through January 1, 2006, for New Year's Eve. On January 2, the Appellant's brother and nephew were killed in a fire and there was testimony from the Appellant's brother and father that they had been with the Appellant on January 2, which is when the Appellant learned of his brother's death.[8] The Appellant testified that on January 2, he had slept all day at Eugene Johnson's home[9] and that he returned to work on January 3. Mr. Johnson, however, testified that the Appellant came to his home on January 1 and that he and the Appellant, who also worked together, returned to work on January 2. Mr. Johnson testified that the Appellant learned of his brother's death on January 2. The Appellant also offered testimony from one witness who last saw the victim on January 1 and another witness who last saw the victim on December 31. Despite the fact that there was testimony that the Appellant had been with various friends and family members during some periods of time prior to the discovery of the victim's body, there

was no evidence presented by the Appellant of any individual that had constantly been with the Appellant in the days prior to the discovery of the victim. Likewise, there was no evidence regarding the exact time of Ms. Pelfry's death. Randy Frye, a field trooper with the West Virginia State Police, testified he was one of the officers who arrived first at the crime scene on January 5, 2006. Upon his arrival, the fire where the victim was burned was still smoldering.

Finally, the Appellant tried to show that another individual, Ada Sloane, killed Ms. Pelfry. Ms. Sloane testified that, in a moment of anger, she had said to her girlfriend that she killed Ms. Pelfry. Ms. Sloane, however, denied killing Ms. Pelfry. The state police also investigated Ms. Sloane and blood stains on a mattress at Ms. Sloane's apartment. The state police found that the blood stains pre-dated Ms. Pelfry's murder. Further, Ms. Sloane testified that her statement about killing Ms. Pelfry was made when she was under the influence of drugs.

At the conclusion of the trial, the jury found the Appellant guilty of murder in the second degree. The trial court sentenced the Appellant to a term of forty years in the state penitentiary.

## II. Standards of Review

There are different standards of review applicable to the issues raised by the Appellant. Each standard of review will be discussed as each assignment of error is addressed.

## III. Discussion of Law

### A. Admissibility of Confession

■ The Appellant argues that the trial court erred in failing to suppress his confession, given to the police on January 10,

---

7. David A. Clayman, Ph.D., a clinical psychologist, testified as the Appellee's rebuttal witness. Dr. Clayman testified that Dr. Miller's methodology was flawed. Dr. Clayman further opined that while Dr. Miller's conclusion might have served as a good starting point, the lack of corroboration and his reliance on self-reporting substantially weakened Dr. Miller's report.

8. The testimony from the Appellant's witnesses was not clear as to when the Appellant's brother

and nephew actually died. While at least two witnesses testified that the Appellant found out about the deaths on January 2, the Appellant testified that he did not learn about the deaths until January 3.

9. Mr. Johnson owned the property where the Appellant resided. The Appellant resided in a building next to where Mr. Johnson and his wife resided.

2006.[10] The Appellant argues that he did not understand the consequences of making such a statement. In contrast, the Appellee maintains that the Appellant was not in custody at the time he confessed to the homicide. The Appellee further argues that the confession came after the Appellee was read his *Miranda* rights and gave a knowing and intelligent waiver of those rights.

■ When reviewing challenges to a circuit court's suppression hearing ruling, the Court is guided by the following review standard:

> On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

Syl. Pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994); Syl. Pt. 2, *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994)("This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggest deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.").

A review of the lengthy and thorough suppression hearing reveals that the trial court did not err in finding that the Appellant was not in police custody at the time he confessed. The Appellant had not been charged with a crime and was repeatedly told by law enforcement officers that he was free to leave at any time. There was no evidence that the Appellant was under the influence of any drugs or alcohol and every officer who testified stated that, although the Appellant could not read, there was no indication that the Appellant did not understand the nature of what he was saying or what he was signing when he signed the waiver.

■ Although the Appellant asked for a lawyer at one point, the unrefuted evidence was that he was not in police custody at the time. Moreover, right after he asked for a lawyer, he indicated that he wanted to continue speaking with a different state police officer. He never indicated to the second officer that he wanted an attorney. This Court held in syllabus point three of *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456, *cert. denied* 516 U.S. 872, 116 S.Ct. 196, 133 L.Ed.2d 131 (1995), that "[t]o the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value." *Id.* at 523, 457 S.E.2d at 460. Thus,

> the *Miranda* right to counsel has no applicability outside the context of custodial interrogation. Therefore, until the defendant was taken into custody, any effort on his part to invoke his *Miranda* rights was, legally speaking, an empty gesture. We believe the "window of opportunity" for the assertion of *Miranda* rights comes into existence only when that right is available.

*Id.* at 530, 457 S.E.2d at 467 (footnote omitted); *see* Syl. Pt. 3, *State v. Middleton*, 220 W.Va. 89, 640 S.E.2d 152 (2006) ("A police officer may continue to question a suspect in a noncustodial setting, even though the suspect has made a request for counsel during the interrogation, so long as the officer's continued questioning does not render statements made by the suspect involuntary."). The trial court's determination that the Appellant was not in police custody at the time he gave his statement was not erroneous. Because he was not in police custody, the right to counsel pursuant to *Miranda*, does not apply.

---

**10.** The Appellant also made an oral statement to the state police on January 5, 2006, in which he referenced the "burnt girl." Additionally, the Appellant gave the state police a second statement on January 5, 2006, in which "he noticed there was smoke coming from the place where everybody party's [sic][,]" and that he had "never hauled any straw up there." Finally, he also told the officer on January 5, that he did it, but then said that he had not done anything. None of these statements are the subject of the Appellant's appeal. The Appellant focuses his argument solely upon the confession that he gave on January 10, 2006.

■ Likewise, the trial court did not err in finding that the Appellant voluntarily signed a waiver prior to confessing to Ms. Pelfry's murder. In upholding the trial court's determination regarding the voluntariness of the Appellant's confession, the Court relies upon its prior decision in *State v. McCracken*, 218 W.Va. 190, 624 S.E.2d 537 (2005). In *McCracken*, the defendant was charged with three counts of murder and one count of arson, stemming from a house fire. *Id.* at 193, 624 S.E.2d at 540. The defendant had voluntarily gone to the police station where she was interviewed. *Id.* During the interview, she explained how she had gone to her boyfriend's parents' home prior to the fire and had tripped over something on the porch, which was possibly a gasoline can. *Id.* She had then thrown her cigarette on the porch and heard a "whooshing sound." *Id.*

The defendant challenged the admissibility of the statement she gave to the police because she was not given her *Miranda* warnings until approximately five hours after providing a written statement. *Id.* at 195, 624 S.E.2d at 542. The focus of the Court, in upholding the trial court's determination that the statement was admissible, was whether the defendant was in police custody. The Court stated that

> Whether the individual was "in custody" is determined by an objective test and asking whether, viewing the totality of the circumstances, a reasonable person in that individual's position would have considered his freedom of action restricted to the degree associated with a formal arrest. [*State v. Potter*] 197 W.Va. [734] at 744, 478 S.E.2d [742] at 752 [1996]; *see also Thompson v. Keohane*, 516 U.S. 99, 113–14 n. 13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *State v. Honaker*, 193 W.Va. 51, 60–61, 454 S.E.2d 96, 105–06 (1994) (utilizing "objective circumstances" test to determine whether the defendant was in custody). In *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995), this Court explained

that "[t]he 'inherent compulsion' that is brought about by the *combination* of custody and interrogation is crucial for the attachment of *Miranda* rights." 193 W.Va. at 530, 457 S.E.2d at 467 (citation omitted).

Analyzing the record in this case, we conclude that the lower court correctly found that the Appellant's statement was voluntary. We find that no reasonable person in the Appellant's position at the time of interviewing by the police would have considered his or her freedom to have been curtailed. The Appellant was told that she was free to leave at any time because she was not under arrest. She visited the police station voluntarily. We find that the Appellant's statement was properly admitted as a voluntary statement.

*McCracken*, 218 W.Va. at 195, 624 S.E.2d at 542.

Likewise, in the instant case, prior to the Appellant confessing to the murder of Ms. Pelfry, he went to the Logan detachment of the West Virginia State Police on his own volition to retrieve a couple of knives that the police had taken from him when he had been transported by the police to the detachment on January 5. Moreover, the Appellant voluntarily remained to speak to the officers. The Appellant was told by the state police officer who interviewed him that he was free to leave. Consequently, the Court finds that the Appellant's statement was properly admitted at trial.

## B. Sufficiency of the Evidence

■ The next issue is whether there was sufficient evidence to support the Appellant's conviction. The Appellant argues that the only evidence the State produced was his statement and that there was no corroborating evidence, forensic or otherwise, which connected the Appellant to the victim or the crime.[11] The Appellee maintains that evi-

11. In support of this argument, the Appellant cites to the due process clause of the West Virginia Constitution. W. Va. Const. art. III, § 10. Other than quoting the due process clause, the Appellant makes no argument regarding how the alleged insufficient evidence violated his due pro-

cess rights. As we stated in *State of West Virginia Department of Health and Human Resources, Child Advocate Office ex rel. Robert Michael B. v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), " '[a] skeletal "argument," really nothing more than an assertion, does not pre-

dence introduced before the jury was sufficient to warrant the conviction of second degree murder.

 The standard of review applicable to the Appellant's claim of insufficient evidence is set forth in syllabus one of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). In *Guthrie*, the Court held that

[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 1.

 Additionally,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part.

 Applying the foregoing standard of review, the record in this case reveals that the Appellee introduced several statements made by the Appellant regarding the death of Ms. Pelfry. First, when the state police began investigating the crime by canvassing the area closest to the crime scene, Trooper Holbert testified that he approached the Appellant, who happened to live nearest to the crime scene, and asked him if he had seen anything unusual coming up or down the road in the last couple of days. The Appellant responded by saying, "Well, you guys are here for the burnt girl." None of the officers had told the Appellant why they were there. Additionally, Trooper Holbert and Deputy Barker noticed two large five or six gallon gas cans sitting in the middle of the driveway. The police officers also saw straw that by their observations was similar to straw found at the crime scene, which had been used to cover up the victim's body.

The Appellee also introduced the Appellant's voluntarily confession to Ms. Pelfry's murder. In his confession, the Appellant explained that he picked her up to have sex with her, that he killed her after she had made fun of him as he had undressed in front of her, and that then he burned the victim's body to get rid of the evidence of his crime.

Finally, the Appellee offered the testimony of the medical examiner who testified that Ms. Pelfry died from blunt force trauma to her head. Her body was then burned and the only portion of her body which was recognizable were her legs.

The Appellant testified that basically everything he told the police was false. The Appellant also offered the testimony of several family members and friends who all testified either that the Appellant had been with them on December 31 and January 1 or that they had seen the Appellant when he found out about the death of his brother and his nephew. This evidence was offered to

serve a claim.... Judges are not like pigs, hunting for truffles buried in briefs.' " (*quoting U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)); *see State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) (noting that "appellate courts frequently refuse to address issues that appellants ... fail to develop in their brief."); *see also Ohio Cellular RSA Ltd. P'ship v.*

*Bd. of Pub. Works of W. Va.*, 198 W.Va. 416, 424 n. 11, 481 S.E.2d 722, 730 n. 11 (1996) (refusing to address issue on appeal that had not been adequately briefed). Because of the inadequacy of the Appellant's argument, the Court only addresses the sufficiency of the evidence as raised by the Appellant under *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

show alibi even though none of the Appellant's witnesses testified that they had been with the Appellant continuously during the time period when Ms. Pelfry was murdered. The Appellant also offered evidence that another person, Ada Sloane, had told her roommate that she killed Ms. Pelfry. The evidence, however, showed that the police, contrary to the Appellant's assertions, investigated Ms. Sloane and the blood evidence found at Ms. Sloane's apartment. The officer's found that the blood evidence, which consisted of stains on a mattress, pre-dated the murder. Moreover, Ms. Sloane testified that although she said that she killed Ms. Pelfry, she made the statement in anger to her roommate and girlfriend, while she was under the influence of drugs. Ms. Sloane testified that she did not kill Ms. Pelfry.

As this Court repeatedly has held, "a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, *in part*. In this case, it is undeniable that the jury was presented with sufficient evidence to support its finding that the Appellant was guilty of second degree murder beyond a reasonable doubt. *Id.* Therefore, this Court finds no error regarding this issue.

### C. Juror Issue

■ The Appellant argues that the trial court denied him due process by allowing a juror to serve on the twelve-member jury panel over the Appellant's objection. The Appellant argues that the juror had an inherent bias against him, because the juror was the minister who presided over the victim's memorial service. Conversely, the Appellee argues that the juror's presence on the jury did not prejudice the Appellant.

■ The abuse of discretion standard of review is used in deciding juror disqualification issues based on bias and prejudice. *See O'Dell v. Miller*, 211 W.Va. 285, 288, 565 S.E.2d 407, 410 (2002).

The juror at issue, Juror Vance, was a preacher who had officiated over the funeral of Mitchell Dowden. Mr. Dowden apparently was the brother of the victim, Ms. Pelfry. Mr. Dowden's family could not afford a burial plot, so Juror Vance's church donated one. Because the juror's church donated the plot, the family asked Juror Vance to officiate over the funeral. Ms. Pelfry's remains were cremated and her ashes were buried with her brother.

On the first day of trial, during a lunch break prior to opening statements, Juror Vance was approached by an unidentified teenage boy, who asked the juror if he had officiated over Mr. Dowden's funeral.[12] At that time, Juror Vance remembered that the girl who was buried with Mr. Dowden was named Mary. Juror Vance did not know that the victim in the Appellant's trial was the girl who had been buried with Mr. Dowden. Juror Vance immediately reported this contact to the bailiff, who informed the trial court. The trial court inquired of Juror Vance about the lunch break encounter in chambers before opening statements.

Juror Vance told the trial court that it did not impact his ability to be juror and that he could be fair, honest and neutral. Once the trial court finished questioning Juror Vance, the trial court instructed him not to talk to anybody about the matter. Then, the Appellant's counsel, "out of the abundance of caution," objected to Juror Vance serving on the jury. The trial court, in response to the objection, took it under advisement and indicated that he was not going to rule on the objection at that time. There was no objection raised by the Appellant to the trial court's decision to defer ruling on the Appellant's objection. Before the matter went to the jury, the trial court struck Juror Vance and replaced him with an alternate.

Based upon a review of the evidence surrounding this issue, there was no information imparted by Juror Vance to the trial court which indicated that he really even knew the victim or the victim's brother, let alone that he harbored any prejudice or bias from performing the funeral. Further, the trial court

---

12. Juror Vance was not wearing his juror badge at the time of this encounter with the teenager. The trial court admonished Juror Vance for this failure.

not only questioned the juror, but instructed him not to discuss the matter with anyone. The trial court ultimately dismissed the juror before the Appellant's case went to the jury. The Court concludes that trial court did not abuse its discretion regarding its handling of this jury issue. *Id.*

### D. Closing Argument

■ The Appellant contends that the Appellee argued during closing arguments that the Appellant graduated from Chapmanville High School and, therefore, knew or should have known what he was signing when he signed his statement confessing to the murder of Ms. Pelfry. The Appellant maintains that "[w]hile it is true[ ] that Mr. Gilman graduated [from] Chapmanville High School, it is not true that this should qualify the defendant as being able to read and comprehend." The Appellant asserts that this argument was in direct contradiction to the Appellant's witness, Dr. Bobby Miller, who found that the Appellant was functionally illiterate and could only read on a second or third grade level. Also, Dr. Miller found that the Appellant's IQ was 83. In contrast, the Appellee argues that when the Appellee made this statement in closing argument there was no objection by the Appellant. Therefore, the Appellant failed to preserve this argument for appeal.

■ The Court consistently has held that "silence may operate as a waiver of objections to error and irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial." *State v. Grimmer*, 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979), *overruled on other grounds by State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980). The raise or waive rule is designed "to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error." *Wimer v. Hinkle*, 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989).

In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), this Court explained as follows:

Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights.... When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

*Id.* at 316, 470 S.E.2d at 635.

■ After reviewing the Appellee's closing argument, there was no objection raised by the Appellant when the Appellee stated that the Appellant graduated from high school. Moreover, even if the Appellant had objected to this, from the Court's review of the entire trial transcript, there was evidence before the jury that the Appellant, indeed, graduated from high school. Accordingly, the Court finds no error was committed by the trial court regarding the closing argument made by the Appellee in this case.

### IV. Conclusion

Based upon the foregoing opinion, the decision of the Circuit Court of Logan County is hereby affirmed.

Affirmed.