No. 13-0821 – *Steven O. Dale, Acting Commissioner of the West Virginia Department of Motor Vehicles v. Anthony Ciccone*

**FILED**

July 18, 2014

**RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA**

Benjamin, Justice, dissenting:

I write separately because I disagree with the majority's conclusion that the traffic stop in this case was lawfully accomplished by Sergeant James Davis.

The stop was made solely pursuant to the information provided by Sharon Marks during a telephone call to the police department. Ms. Marks told the police that she had observed a vehicle with Delaware registration driving erratically and proceeding South on Route 119. Sergeant Davis drove to the area described by Ms. Marks, observed a vehicle matching Ms. Marks's description, and without observing any suspicious or erratic driving, Sergeant Davis stopped the vehicle. Following the stop, respondent Anthony Ciccone was arrested.

The majority relies on Syllabus Points 1 and 2 of *State v. Stuart*, 192 W. Va. 428, 452 S.E.2d 886 (1994), which state:

> 1.      Police officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime. To the extent *State v. Meadows*, 170 W.Va. 191, 292 S.E.2d 50 (1982), holds otherwise, it is overruled.
>
> 2.      When evaluating whether or not particular facts establish reasonable suspicion, one must examine the totality

1

of the circumstances, which includes both the quantity and quality of the information known by the police.

In determining whether a police officer has reasonable suspicion to stop a vehicle on the sole basis of a tip, the tip must be sufficiently reliable to justify a reasonable and articulable suspicion. The majority finds that Ms. Marks's call "provided Sergeant Davis with sufficient indicia of reliability to warrant his articulable reasonable suspicion of unlawful activity and to justify the investigatory stop" because of the information she provided during her call to the police. I disagree with the majority; I do not believe Ms. Marks's call was sufficiently reliable to justify the stop.

In determining whether an informant has provided sufficiently reliable information to justify a reasonable and articulable suspicion, "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' [are] 'highly relevant in determining the value of his report.'" *Alabama v. White*, 496 U.S. 325 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). Ms. Marks's identification of herself lends little weight to her reliability. The majority cites to *Commonwealth v. Love*, 775 N.E.2d 1264 (Mass. App. Ct. 2002) for the proposition that an informant who identifies herself is more reliable because "[i]dentified and readily identifiable individuals expose themselves to charges of filing false reports, and they risk reprisal from those they accuse." Under this reasoning, by the time it is determined whether the tip is a fabrication that may open the informant up to liability—if it can be determined at all—the unjustified encroachment on a driver's rights will have already occurred. Thus, merely identifying oneself, in the absence of any

2

other dealings with the police that might lend support to the informant's reliability, contributes very little to the determination of whether reasonable suspicion for a stop exists.

The quality of the information in the tip in this case also lends little support to its veracity or reliability. The majority looks to *Navarette v. California*, 2014 WL 1577513 (April 22, 2014), in support of its position that Ms. Marks's tip was reliable. In *Navarette*, an anonymous caller[1] phoned a California 911 dispatch team to report that she had been run off of the roadway by another driver. The tip was relayed by the 911 dispatcher to police as follows: "Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8-David-94925. Ran the reporting party off the roadway and was last seen approximately five minutes ago." *Navarette*, 2014 WL 1577513 at *2. An investigating police officer located and stopped the vehicle described by the 911 dispatcher. *Id.* The State did not present evidence that the officer observed any suspicious or illegal behavior prior to the stop. *Id.* at *12 (Scalia, J., dissenting). An additional officer arrived, and the officers approached the stopped vehicle. The officers smelled marijuana, and a subsequent search of the truck revealed thirty pounds of marijuana. *Id.* at *2.

---

[1] The U.S. Supreme Court noted in *Navarette* that the parties did not dispute that the tipster identified herself by name in the 911 call. 2014 WL 1577513 at *2 n.1. However, because neither the caller nor the 911 dispatcher were present at the suppression hearing, the recording of the 911 call was not introduced into evidence. *Id.* Therefore, the lower courts in this case treated the call as anonymous. *Id.*

In evaluating the legality of the stop in *Navarette*, the U.S. Supreme Court examined two of its prior cases: *Alabama v. White*, 496 U.S. 325 (1990), and *Florida v. J. L.*, 529 U.S. 266 (2000).

In *White*, an anonymous tipster alerted police officers that a woman carrying cocaine would drive a brown Plymouth station Wagon with a broken right tail light from a particular apartment building to a particular motel. 496 U.S. at 327. The officers observed the vehicle, stopped it before it reached the motel, and discovered cocaine. *Id.* at 331. The U.S. Supreme Court found that the stop in *White* was lawful. The U.S. Supreme Court said of *White* in *Navarette*, "By accurately predicting future behavior, the tipster demonstrated a special familiarity with respondent's affairs, which in turn implied that the tipster had access to reliable information about that individual's legal activities." *Navarette*, 2014 WL 1577513 at *3 (internal quotations omitted).

In *J. L.*, a tipster informed police officers that a young black male in a plaid shirt standing at a bus stop was carrying a gun. 529 U.S. at 268. This tip was found insufficient to justify a stop because the tipster did not explain how he knew about the gun, his familiarity with the young man's affairs, or any knowledge regarding future behavior that could corroborate the tip. *Id.* at 271–72. In *Navarette*, the U.S. Supreme Court recognized that the tip in *J. L.* "was insufficiently reliable to justify a stop." 2014 WL 1577513 at *3.

4

The U.S. Supreme Court then went on to evaluate the reliability of the tip in *Navarette*. In a 5–4 decision, the U.S. Supreme Court found that the officer conducted a valid stop, which was based only on the anonymous call, because the "call bore adequate indicia of reliability for the officer to credit the caller's account." *Id.* at *4. The U.S. Supreme Court concluded that "the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness,"[2] allowing the police to conduct a legal stop. *Id.* at *6.

The case at bar is distinguishable from *Navarette*. Ms. Marks was not run off of the roadway like the driver in *Navarette*; she only observed what she deemed to be "erratic" driving. The "erratic" driving may have been the driver's attempt to avoid hitting an animal in the roadway, or a temporary swerve resulting from the driver's attempt to pick up a dropped object in the vehicle.[3] Without more information, it is impossible to conclude that the driving witnessed by Ms. Marks was likely the result of intoxication. Additionally, her information about the vehicle was far less specific than the

---

[2] *Navarette* states, "[R]unning another car off the highway . . . bears too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness." 2014 WL 1577513 at *6.

[3] Although Mr. Ciccone admitted to driving the vehicle earlier that night, it is unclear whether Mr. Ciccone was driving the vehicle when Ms. Marks made her call to police, and whether Mr. Ciccone was intoxicated when he drove the vehicle.

information provided in *Navarette*. Further, Ms. Marks's call did not indicate a familiarity with the driver's affairs like the informant in *White*. Thus, even if this Court interpreted West Virginia's constitutional protections against unreasonable searches and seizures in a manner identical to the U.S. Supreme Court's interpretation of the federal constitution in *Navarette*,[4] the totality of the information provided in this case is too tenuous to provide reasonable suspicion to support a lawful stop.

The majority's approach in this case of not requiring the officer to personally observe and personally articulate a proper basis for a stop opens the door to troubling scenarios. For instance, tips of drunk driving may be used by spurned lovers or vengeful drivers as a tool to abuse others with, as discussed above, little likelihood of repercussion. Lest the State become complicit in such abuse, it must carefully examine the reliability of the tips police officers receive. The best indicator of an informant's reliability is police corroboration, either through familiarity with the informant or witnessing the suspect's suspicious behavior. *See* syl. pt. 4, *Stuart*, 192 W. Va. 428, 452 S.E.2d 886 ("A police officer may rely upon an anonymous call if subsequent police work or other facts support its reliability and, thereby, it is sufficiently corroborated to

---

[4] The primary tenant of federalism permits West Virginia to place higher standards on its police pursuant to its own laws—such as a stricter standard for reasonable suspicion—than those required by the federal government, *see, e.g.*, syl. pt. 2, *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979) ("The provisions of the Constitution of the State of West Virginia may, in certain instances, require higher standards of protection than afforded by the Federal Constitution.").

6

justify the investigatory stop under the reasonable-suspicion standard."). Because I

believe reasonable suspicion to justify a stop requires more than what was found by the

majority in this case, I dissent.[5]

---

[5] As I said in my dissent in *Miller v. Toler*, 229 W. Va. 302, 313 n.3, 729 S.E.2d 137, 148 n.3 (2012), in no way through this dissent do I intend to lessen the gravity of the great harm and danger drunk drivers pose to the people of West Virginia. I firmly believe that there is a "very valid public policy concern to rid our highways of drunken drivers" and that the government has a strong interest in doing just that. *Fishbein v. Kozlowski*, 252 Conn. 38, 743 A.2d 1110, 1126 (1999) (Norcott, J., dissenting). While the goal of eliminating drunk drivers from our roadways is an admirable one, the goal should not be achieved by subjecting our citizens to the violation of their constitutional rights.

Likewise, I do not through this dissent intend to disrespect the important and often difficult efforts of our law enforcement personnel. There is no assertion herein that the officers in question deliberately sought to violate any rights of the driver. The enforcement of individual constitutional rights does no more disservice to law enforcement officers than does the existence of the rights themselves.