# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**James N. Mauldin,**
**Petitioner Below, Petitioner**

**vs.)  No. 21-0172** (Berkeley County 2016-C-155)

**Shelby Searls, Superintendent, Huttonsville**
**Correctional Center,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner James N. Mauldin, by counsel S. Andrew Arnold, appeals the Circuit Court of Berkeley County's December 1, 2020, order dismissing his amended petition for a writ of habeas corpus. Respondent State of West Virginia, by counsel Patrick Morrisey and William E. Longwell, filed a response in support of the circuit court's order.[1]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

This petition for a writ of habeas corpus stems from petitioner's felony convictions of death of a child by a parent, guardian, or custodian by child abuse; child abuse causing serious bodily injury; malicious assault; and two counts of gross child neglect creating substantial risk of injury, in addition to presentation of false information regarding a child's injuries (a misdemeanor), all related to the death of petitioner's three-year-old son, Kaiwon "K.C." Connelly. As a result of his convictions, petitioner was sentenced to a forty-year term of incarceration for death of a child by a parent, guardian, or custodian by child abuse. The remaining sentences were ordered to run concurrently to that sentence.

Prior to filing the instant petition, petitioner directly appealed his convictions to this Court, and we affirmed the convictions by memorandum decision in *State v. Mauldin*, Case No. 14-1142,

---

[1]In his notice of appeal, petitioner named the Superintendent of Huttonsville Correctional Center, Marvin C. Plumley, as respondent herein. However, the Superintendent of Huttonsville Correctional Center is Shelby Searls, and the Court reflects the change accordingly.

1

2016 WL 6756794 (W. Va. Nov 15, 2016)(memorandum decision).[2] As we set forth in that memorandum decision:

> The State's evidence at trial revealed that Mauldin lived in Martinsburg, West Virginia with his girlfriend, Jasmine Dawkins, and the couple's infant son. Mauldin shared custody of his other son, three-year-old [K.C.], with the child's mother, Shevecka Connelly, a Maryland resident. K.C. spent Thanksgiving Day 2011 with his mother before being picked up by Mauldin to visit for a few weeks. During the month of December, Ms. Connelly, who was without a vehicle, repeatedly and unsuccessfully attempted to contact Mauldin to arrange for K.C.'s return. On New Year's Eve 2011, an ambulance was dispatched to Mauldin's home in response to a call that K.C. had fallen and "busted his lip." When the ambulance arrived, K.C. was discovered, wet and cold, in full cardiac arrest on the bathroom floor.
>
> Paramedics restored K.C.'s pulse and took him to the hospital. There, K.C. was observed to have visible scrapes, bruising, and swelling to the face, a lesion on both sides of his upper lip, and bruising around the entire circumference of his wrists. A mark on his thigh resembled the shape of a handprint. K.C.'s shorts were stuck to him and difficult to remove; when they were finally stripped away, K.C. was found to have suffered third-degree burns across his entire buttock area and at the top of one thigh. A CT scan disclosed various instances of subdural bleeding throughout both hemispheres of K.C.'s brain. Mauldin explained to a responding trooper that K.C. had fallen in the bathroom. The trooper later arrested Mauldin at the hospital upon being informed of the burns, though Mauldin asserted that K.C. had sustained them during the Thanksgiving stay with his mother.
>
> K.C. was transported by helicopter to Children's National Hospital in Washington, D.C., where he died the next day. An autopsy was performed, confirming K.C.'s myriad traumas and revealing that the child had also been suffering from pneumonia. The medical examiner ruled that K.C.'s death was a homicide caused by multiple acute and chronic injuries.
>
> . . .
>
> Dawkins stood trial in November 2013, after which she was convicted by a jury on [two counts of gross child neglect creating substantial risk of bodily injury], but acquitted on [one count of death of a child through child abuse by a parent, guardian, or custodian].

---

[2]On direct appeal, petitioner argued that the circuit court erred in admitting inculpatory text messages between himself and his co-defendant. *See infra.* By a supplemental brief filed by petitioner acting as a self-represented litigant, petitioner also argued that he received ineffective assistance of counsel, that he was denied compulsory process as a result of the co-defendant's severance and absence from his trial, and that he received a disparate sentence from his co-defendant.

Mauldin's jury trial commenced on March 25, 2014. The prosecution introduced a series of text messages sent in 2011 from late November to mid-December between telephones whose numbers were registered to Mauldin and Dawkins. The messages from Mauldin's phone were to the effect that the sender, *inter alia*, intended "to beat [K.C.] until he [listens]," agreed that K.C. "like[s] getting spankings," related that "I can't wait till I get home ... [t]o beat em" after K.C. had urinated on himself, and, upon being informed of K.C.'s insubordination, threatened to "cave his little chest in."

On April 1, 2016, petitioner filed a petition for a writ of habeas corpus. Upon reviewing the petition, the circuit court appointed counsel for petitioner and directed the filing of an amended petition. Petitioner's amended petition was filed on July 9, 2019, and included various grounds for relief, including that petitioner received ineffective assistance of counsel and that the prosecuting attorney made prejudicial statements during trial. After conducting an omnibus hearing in August of 2020 and considering all of the evidence and the record in its entirety from the underlying case, the habeas court issued a lengthy order denying petitioner relief on all grounds. Petitioner now appeals the circuit court's December 1, 2020, order denying him habeas corpus relief.

As this matter is an appeal from the circuit court's order denying habeas relief, we review as follows:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *Meadows v. Mutter*, 243 W. Va. 211, 842 S.E.2d 764 (2020).

> "On an appeal to this Court the appellant bears the burden of showing that there was error in the proceedings below resulting in the judgment of which he complains, all presumptions being in favor of the correctness of the proceedings and judgment in and of the trial court." Syl. Pt. 2, *Perdue v. Coiner*, 156 W. Va. 467, 194 S.E.2d 657 (1973).

Syl. Pt. 2, *Dement v. Pszczolkowski*, 245 W. Va. 564, 859 S.E.2d 732 (2021).

Notably, petitioner's appeal fails to comply with Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure, as he has failed to support his arguments with a single citation to the 956-page appendix record. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires that "[t]he argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal." Critically, this Rule also provides that "[t]he Court may disregard errors that are not adequately supported by specific references to the record on appeal." *Id.* As we have previously stated, "[a] skeletal 'argument,' really nothing more than an assertion, does not

3

preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs." *State v. Kaufman*, 227 W. Va. 537, 555 n.39, 711 S.E.2d 607, 625 n.39 (2011) (citation omitted).

Therefore, we conclude that petitioner has failed to show that he is entitled to the relief sought. Petitioner's brief to this Court largely makes the same arguments that he made before the habeas court, and he fails to identify or allege any specific error in the habeas court's conclusions on those issues. In light of our conclusion that the circuit court's order and the record on appeal reflect no clear error, we hereby adopt and incorporate the circuit court's well-reasoned findings of fact and conclusions of law from its order and direct the Clerk to attach to this memorandum decision a copy of the circuit court's December 1, 2020, "Order Denying Petitioner's Petition for Writ of Habeas Corpus Relief."

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** August 31, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn

/s/ Bridget Cohee
Circuit Court Judge
Ref. Code: 205JT8R3

E-FILED | 12/1/2020 11:24 AM
CC-02-2016-C-155
Berkeley County Circuit Clerk
Virginia Sine

## In the Circuit Court of Berkeley County, West Virginia

JAMES N. MAULDIN C/O
HUTTONSVILLE CORRECTIONAL
CENTER,
Plaintiff,

vs.)

MARVIN C. PLUMLEY,
James N. Mauldin,
James N. Mauldin,
Defendants

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CC-02-2016-C-155

### Final Order Denying Writ of Habeas Corpus Relief

On the 28th day of August, 2020, this matter came before the Court for oral argument. The matter was heard by videoconference in response to the health and safety guidelines issued in response to the novel coronavirus pandemic without objection from the parties. Appearing was the Petitioner; Dana McDermott, Esq., counsel for the Petitioner; and Assistant Prosecuting Attorney Cheryl K. Saville, Esq., counsel for the Respondent. The Court further noted the appearances of friends and family members of the Petitioner who called into the hearing to observe argument.

Following the argument of counsel, the Petitioner gave argument, *pro se*, which the Court ordered be filed in written form herein and incorporated into the record. When Petitioner's counsel filed the same, he noted that the Petitioner was reading from a prior amended habeas petition that was never filed that was prepared by a prior habeas counsel of the Petitioner. Upon finding out the same, the State urged the Court not to consider the same. However, the Court does consider the same to the extent that it argues what was contained in the Petitioner's original petition.

Based upon the proceedings formerly read and had herein, upon review of the underlying records in State v. Jasmine K. Dawkins, Case No. 12-F-132 and State v. James N. Mauldin; Case No.: 12-F-135; and upon review of applicable law, the Court hereby DENIES the Amended Petition for Writ of Habeas Corpus. In so doing, the Court makes the following findings of fact and conclusions of law:

1. Petitioner was indicted jointly with his codefendant Jasmine Dawkins, by a Berkeley

County grand jury in May of 2012, on one (1) felony count of Death of a Child by a Parent, Guardian or Custodian by Child Abuse, one (1) felony count of Child Abuse Causing Serious Bodily Injury, one (1) felony count of Malicious Assault, two (2) felony counts of Gross Child Neglect Creating Substantial Risk of Serious Bodily Injury, and one (1) misdemeanor count of Presentation of False Information Regarding a Child's Injuries. [Indictment, 5/23/12, State v. James N. Mauldin, Berkeley County Circuit Court Case No. 12-F-135.]

2. The facts giving rise to the indictment were as follows: On December 31, 2011, an ambulance responded to the residence of the Petitioner where he lived with his girlfriend, Jasmine Dawkins, the Petitioner's 3-year-old son Kaiwon, and the Petitioner's 3-month old son James. Upon arrival, paramedics found 3-year-old Kaiwon wet and cold, bruises on his face and arms, wearing only a pair of shorts, and in full cardiac arrest on the bathroom floor. [Tr. 3/25/14, pg. 202-212, 212-220.] Once paramedics saw the condition of the child, they called for law enforcement. [Id.] Kaiwon was rushed to the hospital where his condition was assessed in more detail.

The child had visible bruising and swelling to his face. [Tr. 3/25/14, pg. 225, Tr. 3/27/14, pg. 530-537, 572-581.] Again, he was noted to be wet and cold to the touch. [Tr. 3/27/14, pg. 572-581 at 575.] The ER nurse indicated that there were multiple areas on the child's head that felt like a "squishy rotten tomato." [Id.] There was bruising all the way around his wrists as though someone had forcefully held him down. [Tr. 3/25/14, pg. 225-226; Tr. 3/27/14, pg. 530-537 at 535, 572-581.] He had a "slap injury" on his thigh that looked like a hand print. [Tr. 3/27/14, 572-581 at 576.] When medical personnel attempted to remove the child's shorts, they found that it was difficult to do so because his clothing was stuck to him. Upon removing his shorts, they discovered the child had third degree burns across the entirety of his buttocks and on the top of one thigh. [Tr. 3/25/14, pg. 222-241 at 226-227; Tr. 3/27/14, 530-537 at 532, 535, 572-581, at 576.] When they removed the stuck-on clothing, they found that the dead, rotting skin on and around the wounds was pulled off with them, causing bleeding of the area and a release of the smell of decaying skin. [Id.] A head CT scan revealed multiple areas of subdural bleeding around the child's brain: on both the left side and the right side, between the upper and lower part of the brain, and also between the left and right hemispheres of the brain. [Tr. 3/26/14, pg. 248-258 at 252.] Local medical personnel arranged for emergency helicopter transport of the child to Children's National Hospital in Washington, D.C. even though they did not expect the child to survive because they wanted to give him his very best chance. [Tr. 3/25/14, pg. 230-232, Tr. 3/27/14, pg. 578-579.] Kaiwon ultimately passed away. The medical examiner determined that the cause of his death was multiple acute and chronic injuries and the manner of

death was homicide. [Tr. 3/26/14, pg. 266-267.] The medical examiner detailed the numerous injuries she had noted to the child. [Tr. 3/26/14, pg. 259-298.]

3. The Petitioner's co-defendant, Jasmine Dawkins, moved the Court to sever her trial from that of the Petitioner, which motion was granted by the Court. [Pre-Trial Conference Order for October 31, 2013.] The State elected to try co-defendant Dawkins first. [Id.]

4. Following a trial by jury on November 4-8, 2013, co-defendant Dawkins was convicted of two (2) felony counts of Gross Child Neglect Creating Substantial Risk of Serious Bodily Injury, and one (1) misdemeanor count of Presentation of False Information Regarding a Child's Injuries. Co-Defendant Dawkins was acquitted of Death of a Child by a Parent, Guardian or Custodian by Child Abuse. [Verdict Form, 11/8/13; Tr. 11/8/13, pg. 1053-1056; Jury Verdict Order, 11/19/13, State v. Jasmine K. Dawkins, Berkeley County Circuit Court Case 12-F-132.] Co-Defendant Dawkins testified in relevant part in her own defense at her trial that the Petitioner was physically and emotionally abusive to her throughout the course of their relationship such that she was scared of the Petitioner; that the Petitioner threatened her with weapons on at least two (2) occasions when she had left or attempted to leave; that the Petitioner caused the burns to the child's buttocks by making him do squats while nude over a hot pan as a form of punishment; that she witnessed the Petitioner punch the child in the head with a closed fist on one occasion shortly before the child's death; and that she could not say whether the Petitioner ever hit the child on other occasions. [Tr. 11/7/13, pg. 769-856, 893-950.] She conceded that she did not seek help for the child after these instances even though she saw his injuries from the burn and noted a change in his demeanor and behavior after the blow to the head. [Id.] She further conceded that she was not truthful with care providers at first about the cause of the child's injuries. [Id.] She maintained throughout that the cause of her silence and dishonesty was her fear of the Petitioner. [Id.]

5. Following a trial by jury on March 25-28, 2014, the Petitioner was found guilty of one (1) felony count of Death of a Child by a Parent, Guardian or Custodian by Child Abuse; one (1) felony count of Child Abuse Causing Serious Bodily Injury; one (1) felony count of Malicious Assault; two (2) felony counts of Gross Child Neglect Creating Substantial Risk of Serious Bodily Injury; and one (1) misdemeanor count of Presentation of False Information Regarding a Child's Injuries. [State v. Mauldin, 12-F-135, Verdict Form, 3/28/14; Tr. 3/28/14, pg. 773-776; Jury Verdict Order, 4/15/14.] Jasmine Dawkins was not called as a witness by either party during the Petitioner's trial. [Tr. 3/25/14-3/28/14, *passim*.]

6. Thereafter, the Petitioner, by counsel, filed a number of post-trial motions, which were denied by the court. [Defendant's Renewed Motion for Judgment of Acquittal after

Discharge of Jury, 4/15/14; Defendant's Motion for New Trial, 4/15/14; Tr. 9/11/14, pg. 3-6; Post Trial Motions Hearing Order and Sentencing Order, 10/3/14.]

7. On or about September 11, 2014, upon completion of a diagnostic evaluation and pre-sentence investigation report and in consideration of the presentation of the parties and the jury's verdict, the Court sentenced the Petitioner serve a statutory definite term of forty (40) years of incarceration in the penitentiary upon his conviction for Death of a Child by a Parent, Guardian or Custodian by Child Abuse; the statutory term of not less than two (2) nor more than ten (10) years in the penitentiary upon his conviction for Child Abuse Causing Serious Bodily Injury; the statutory term of not less than two (2) nor more than ten (10) years in the penitentiary upon his conviction for Malicious Assault; statutory terms of not less than one (1) nor more than five (5) years in the penitentiary upon each of his two (2) convictions for Gross Child Neglect Creating a Substantial Risk of Serious Bodily Injury; and a statutory definite term of one (1) year in jail upon his conviction of Presentation of False Information Regarding a Child's Injuries. [Tr. 9/11/14, pg.6-33; Post Trial Motions Hearing Order and Sentencing Order, 10/3/14.] The Petitioner's sentences were ordered to run concurrently with one another. [Id.] The Court also imposed fines and costs. [Id.]

8. Thereafter, the Petitioner filed a notice of direct appeal of his conviction and sentence to the West Virginia Supreme Court of Appeals. The Petitioner's allegations of error in the appeal included the sufficiency of evidence, error in admission of the Petitioner's statements, error in admission of the text messages, whether the Petitioner's right to compulsory process was violated, and whether the Petitioner received disparate treatment and sentence from that of his co-defendant. Following a full briefing of the case (which included a brief from counsel as well as a supplemental *pro se* brief filed directly by the Petitioner) as well as oral argument, the West Virginia Supreme Court of Appeals affirmed the Petitioner's convictions and sentence. State v. Mauldin, No. 14-1142 (W.Va. Supreme Court, November 15, 2016)(memorandum decision), 2016 WL 6756794.

9. On or about April 1, 2016, the Petitioner filed a *pro se* petition in the instant matter. [Petition Under W.Va. Code §53-4A-1 for Writ of Habeas Corpus, 4/1/16.]

10. Upon a review of the pro se filings, the Court appointed counsel to represent the Petitioner and aid in the preparation of an amended petition. [Order Appointing Counsel, Directing Counsel for Petitioner to File an Amended Petition and Directing Petitioner to Complete Lost List, 5/3/16.]

11. The Petitioner, through counsel, filed an Amended Petition and Losh list on or about July 9, 2019. [Petitioner's Amended Omnibus Petition for a Writ of Habeas Corpus ad

Subjiciendum, 7/9/19; Checklist of Grounds for Post-Conviction Habeas Corpus Relief, 7/9/19.]

12. The Respondent, pursuant to the orders of the Court, filed a full and complete response to the allegations contained in the Amended Petition. [Order Directing the State to File a Response, 9/12/19; Order Granting Respondent's Motion for Extension of Time to File Response, 12/10/19; Respondent's Return to and Motion to Dismiss Amended Petition for Writ of Habeas Corpus, 2/7/20; Respondent's Memorandum in Support of Motion to Dismiss Amended Petition for Writ of Habeas Corpus, 2/7/20.]

13. A habeas corpus procedure is "civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case." State ex rel. Harrison v. Coiner, 154 W.Va. 467, 176 S.E.2d 677 (1970); **W. Va. Code** § 53-4A-1(a).

14. A convicted criminal has the right to one omnibus post-conviction habeas proceeding. The West Virginia Supreme Court of Appeals holds:

> In general, the post-conviction habeas corpus statute...contemplates that every person convicted of a crime shall have a fair trial in the circuit court, an opportunity to apply for an appeal to this Court, and one omnibus post-conviction hearing at which he may raise any collateral issues which have not previously been fully and fairly litigated.

Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606, 609 (1981).

15. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed. Syl. Pt. 4, State ex rel. McMannis v. Mohn, 163 W.Va. 129, 254 S.E.2d 805 (1979), cert. den., 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 112 (1983)." Syl. Pt. 9, State ex rel. Azeez v. Mangum, 195 W. Va. 163, 465 S.E.2d 163 (1995); Syl. Pt., State ex rel. Phillips v. Legursky, 187 W. Va. 607, 420 S.E.2d 743 (1992).

16. Moreover, "[t]here is a strong presumption in favor of the regularity of court proceedings and the burden is on the person who alleges irregularity to show affirmatively that such irregularity existed." Syl. Pt. 2, State ex rel. Scott v. Boles, 150 W. Va. 453, 147 S.E.2d 486 (1966); State ex rel. Massey v. Boles, 149 W. Va. 292, 140 S.E.2d 608 (1965); Syl. Pt. 1, State ex rel. Ashworth v. Boles, 148 W. Va. 13, 132 S.E.2d 634 (1963).

17. Due to this strong presumption of regularity, statutory law requires that a petition for writ of habeas corpus ad subjiciendum shall "specifically set forth the contention or contentions and grounds in fact or law in support thereof upon which the petition is based[.]" **W. Va. Code** § 53-4A-2.

18. The reviewing court shall refuse, by written order, to grant a writ of habeas corpus if the petition, along with the record from the proceeding resulting in the conviction and the record from any proceeding wherein the petitioner sought relief from the conviction show that the petitioner is entitled to no relief or that the contentions have been previously adjudicated or waived. **W. Va. Code** § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, 215 W.Va. 729, 601 S.E.2d 49, 54 (2004); Perdue v. Coiner, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979).

19. In order to prevail on an issue previously adjudicated during the criminal proceeding, the petitioner must prove that the trial court's ruling is "clearly wrong". **W. Va. Code** § 53-4A-1(b). Grounds not raised by a petitioner in his petition are waived. Losh v. McKenzie, 166 W. Va. 762, 277 S.E.2d 606, 612 (1981); *see also*: State ex rel. Farmer v. Trent, 206 W. Va. 231, 523 S.E.2d 547 (1999), at 550, n. 9.

20. Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived. Syl. Pts. 1 & 2, Ford v. Coiner, 156 W. Va. 362, 196 S.E.2d 91 (1972).

21. The reviewing court has a mandatory statutory duty to enter an order denying the relief requested in a habeas petition if the record demonstrates that a habeas petitioner is entitled to no relief. That statute reads, in part:

> If the petition, affidavits, exhibits, records and other documentary evidence attached thereto, or the return or other pleadings, or the record in the proceedings which resulted in the conviction and sentence, or the record or records in a proceeding or proceedings an a prior petition or petitions filed under the provisions of this article, or the record or records in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, show to the satisfaction of the court that the petitioner is entitled to no relief, or that the contention or contentions and grounds (in fact or law) advanced have been previously and finally adjudicated or waived, the court shall enter an order denying the relief sought.

**W. Va. Code** § 53-4A-7(a); *see also* **W. Va. Code** § 53-4A-3(a) and Perdue v. Coiner, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979).

22. Furthermore, **W. Va. Code** § 53-4A-1, *et seq.*, "contemplates the exercise of discretion by the court", authorizing even the denial of a writ without hearing or the appointment of counsel. Perdue v. Coiner, *supra*.

23. When denying or granting relief in a habeas corpus proceeding, the court must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. State ex rel. Watson v. Hill, 200 W. Va. 201, 488 S.E.2d 476 (1997).

24. The Petitioner is not entitled to relief on any ground alleged in the Amended Petition

for Writ of Habeas Corpus.

## Allegations of Ineffective Assistance of Counsel

25. A review of records show that the admission of the Petitioner's text messages was not only extensively litigated throughout the underlying criminal action, but the Petitioner appealed the admission of the text messages to the West Virginia Supreme Court of Appeals, which found no error in their admission.

26. As such, any error related to the admission of the text messages in this case has been previously finally adjudicated.

27. The Petitioner undertakes no discussion of the law in order to demonstrate that the previous decisions of the trial court and West Virginia Supreme Court of Appeals on this issue were "clearly wrong." Moreover, the Court finds these prior decisions to be legally sound upon review.

28. Therefore, because this issue has been previously finally adjudicated, the Petitioner is entitled to no relief. **W. Va. Code** § 53-4A-1(b), -3(a), -7(a); State ex rel. Markley v. Coleman, *supra.*; Perdue v. Coiner, *supra.*

29. Moreover, the Petitioner's allegation that trial counsel was ineffective regarding the admission of the text messages is plainly misplaced.

30. The West Virginia Supreme Court of Appeals reiterated the standards necessary to prove ineffective assistance of counsel:

> 1. 'In West Virginia Courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in Strickland v. Washington. 466 U.S. 668, 104 S.Ct. 2052, 80 L.E.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.' Syl. Pt. 5, State v. Miller, 194 W.Va. 3, 459 S.E.2d 114 (1995).
>
> 2. 'In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.' Syl. Pt. 6, State v. Miller, 194 W.Va. 3, 459 S.E.2d 114 (1995).
>
> 3. 'Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses

of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.' Syl. Pt. 21, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

4. 'One who charges on appeal that his trial counsel was ineffective and that such resulted in his conviction, one must prove the allegation by a preponderance of the evidence.' Syl. Pt. 22, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

Syl Pt. 1-4, State ex rel Kitchen v. Painter, 226 W.Va. 278, 700 S.E.2d 489 (2010).

31. Counsel for the Petitioner filed an objection and motion in limine with regard to the anticipated introduction of the text messages in this case. [Objection and Motion in Limine Regarding Text Messages, 3/314.]

32. Petitioner's counsel further supplemented that filing with additional case law and analysis. [Defendant James N. Mauldin's Supplementation to Objection/Motion in Limine, 3/3/14.]

33. The State filed a response to the Petitioner's motion, and the trial court conducted a hearing on the motion before ultimately entering an order allowing the admission of the text messages subject to the ability of the State to corroborate the identity of the Petitioner as the sender through the use of circumstantial evidence at trial. [Response to Motion in Limine Regarding Text Messages, 3/11/14; Tr. 3/12/14; Additional Pre-Trial Hearing Order, 4/15/14.]

34. Petitioner's counsel noted the Petitioner's objection to the Court's ruling on the record to preserve the issue for appeal. [Id.]

35. On appeal, both Petitioner's counsel and the Petitioner in his *pro se* brief raised the admission of the text messages, which had been properly preserved for appeal by trial counsel, as error. The West Virginia Supreme Court of Appeals fully considered the arguments and found no error in the admission of the text messages. [Memorandum Decision, 11/21/16, State v. Mauldin, No. 14-1142 (W.Va. Supreme Court, November 15, 2016)(memorandum decision), 2016 WL 6756794.]

36. Petitioner's trial counsel was not ineffective in advocating that the text messages not be admitted. He obviously did everything he could to try to ensure that they would not be. Counsel's performance, therefore, was not deficient under an objective standard of reasonableness. Strickland v. Washington, *supra.*; State v. Miller, *supra.*; State ex rel. Kitchen v. Painter, *supra.*

37. Furthermore, Petitioner's defense and theory of the case at the time the matter went to trial was that his co-defendant Dawkins had actually committed the offenses charged. Counsel

for the Petitioner emphasized in closing that the text messages allegedly sent by Dawkins were admissions by her to actually committing abuse whereas the text messages allegedly send by the Petitioner were only threats but no admissions to any actual hitting of the child. [Tr. 3/28/14, pg. 752-753.] This is the exact argument the Petitioner complains was not advanced by his counsel at trial under this subheading in the Amended Petition. [Petitioner's Amended Omnibus Petition for a Writ of Habeas Corpus ad Subjiciendum, II. Ineffective Assistance of Counsel, pg. 7-8.] Counsel clearly did make this argument from a plain reading of the record.

38. Based upon the above, the Petitioner is not entitled to relief on any allegations surrounding counsel's handling of the text messages introduced at trial. Strickland v. Washington, *supra*.; State v. Miller, *supra*.; State ex rel. Kitchen v. Painter, *supra*.

39. As discussed above, Petitioner's co-defendant, Jasmine Dawkins, was tried first after the trial court granted a motion to sever defendants. Her trial took place November 3-8, 2013. Dawkins testified in her own defense at her trial on November 7, 2013. [Tr., 11/7/13, pg. 769-860, 893-951.]

40. During the numerous times the Petitioner raises an issue regarding Dawkins' testimony at her own trial, the Petitioner never fully discusses the entirety of her testimony nor acknowledges the obvious practical issues with the Petitioner attempting to call Dawkins as a witness at his own trial.

41. First, after her conviction and sentence, Dawkins filed an appeal with the West Virginia Supreme Court of Appeals. [State v. Dawkins, 12-F-135, Memorandum Decision, 5/26/15, State v. Dawkins. No. 14-0538 (April 13, 2015, W.Va. Supreme Court)(memorandum decision), 2015 WL 1740404.]

42. There is decided precedent in the State of West Virginia that even if one enters a guilty plea and testifies as to a factual foundation for that plea of guilty, he may still assert his Fifth Amendment right not to testify in a co-defendant's trial if he has expressed his intention to appeal his conviction. *See* Syl. Pt. 4, State v. Grimmer, 162 W.Va. 588, 251 S.E.2d 780 (1979), *overruled in part on other grounds by* State v. Petry, 166 W.Va. 153, 273 S.E.2d 346 (1980).

43. Therefore, even though Jasmine Dawkins testified on her own behalf at her trial, because she was appealing that conviction, there was legal precedence supporting her continued ability to assert her Fifth Amendment right against self-incrimination if she would have been called to testify at the Petitioner's trial.

44. Moreover, Dawkins testified at her trial that the Petitioner was physically and emotionally abusive to her throughout the course of their relationship such that she was scared of the Petitioner. [Tr. 11/7/13, pg. 769-856, 893-950.] Dawkins testified that the Petitioner

threatened her with weapons on at least two (2) occasions when she had left or attempted to leave him in the past. [Id., pg. 812, 814-815.] Dawkins further testified that the Petitioner caused the burns to the child's buttocks by making him do squats while nude over a hot pan as a form of punishment. [Id., pg. 817-822, 910.] Dawkins indicated that they had begun making Kaiwon do regular squats as a form of punishment but that the Petitioner did not like that Kaiwon would get tired and sit down, so he heated a pan on the stove, took Kaiwon's clothing off, and made Kaiwon do squats over the hot pan. [Id.] After becoming tired, Kaiwon then sat on the pan, causing the burns. [Id.] She testified that the burn happened on December 19, 2011. [Id., pg. 822.] She later testified that she had tried to leave the house with the kids the day after this, but the Petitioner beat her. [Id., pg. 934-935.] She then indicated that the Petitioner began sleeping near the front door of the apartment to prevent her from leaving. [Id., pg. 824-825.] She further testified that the burns were so bad that Kaiwon could not walk after that. [Id., pg. 909.]

Dawkins additionally testified to having personally witnessed the Petitioner punch Kaiwon in the head with a closed fist on one occasion a couple days before he died. [Id., pg. 803-804.] She described the Petitioner as coming into the room where she was trying to comfort Kaiwon afterwards, laughing and saying "I'm messing you all up good." [Id., pg. 806.] She further indicated that she noted a change in Kaiwon's behavior following that hit, describing him as being lethargic, falling down, and crying at times. [Id., 796-797, 949.] Dawkins also testified that she could not say if the Petitioner had hit Kaiwon on other occasions because she would tend to the baby while Kaiwon would be with the Petitioner. [Id., pg. 939-940.] Dawkins indicated that when the Petitioner's father stopped by the house on the 31st of December that the Petitioner had put her and the children in the bathroom so that his father would not see the injuries to her or Kaiwon. [Id., pg. 829.] Dawkins further described Kaiwon collapsing and urinating on himself they day he died. [Id., pg. 799-802.] She stated that the Petitioner did not respond to her calls for help until she told him that Kaiwon had peed on himself at which time the Petitioner told her that he was going to let Kaiwon lay there (in his own urine) so that he could think about why he peed on himself. [Id., pg. 802.] It was a short time later they noticed that Kaiwon had stopped breathing and the Petitioner then attempted to revive him with cold water. [Id.] Dawkins continuously testified that she did not report the abuse to herself or to Kaiwon out of fear of the Petitioner. [Id., pg. 781, 782, 809, 810, 811, 833, 853, 925-926, 930-934, 937, 950.] She also reported that she was afraid to leave Kaiwon alone in the house with the Petitioner. [Id., pg. 846, 930.] Through her testimony, she conceded that she did not seek help for Kaiwon even though she saw his injuries and noted his change in demeanor and

behavior but maintained the cause of her silence was her fear of the Petitioner.

45. In large part because of her testimony, Dawkins was acquitted of Death of a Child by a Parent, Guardian or Custodian by Child Abuse but was convicted of two (2) counts of Gross Child Neglect Creating Substantial Risk of Serious Bodily Injury, and one (1) count of Presentation of False Information Regarding a Child's Injuries.

46. Following Dawkins' trial, both the State and the Petitioner had to strategically determine a course of action regarding whether to attempt to call Jasmine Dawkins as a witness in the Petitioner's trial. Due to the case law indicating that Dawkins could have still asserted her Fifth Amendment right to remain silent due to the ongoing and active appeal of her conviction, each side was forced to weigh the pros and cons of calling her as a witness. If the State would have called her and she would have asserted her Fifth Amendment right, that would not have been helpful to the State in prosecuting the Petitioner. However, if the State would have called her and she would have testified in conformity with the testimony offered at her own trial, that would have been of great benefit to the State in prosecuting the Petitioner. Likewise, if the Petitioner would have called Dawkins to testify and she would have asserted her Fifth Amendment right to remain silent, the Petitioner could have had the jury witness that assertion. However, if the Petitioner would have called Dawkins to testify and she would have testified in conformity with the testimony offered at her own trial, that would have been devastating to the Petitioner's case and would have all but assured his conviction.

47. The Court finds that the testimony of Jasmine Dawkins, had she testified in conformity with her own trial testimony, would not have been of benefit to the Petitioner, rather it would have been detrimental to his defense.

48. As set forth above, Dawkins did not *just* testify that she witnessed the Petitioner hit Kaiwon only one time. She testified she witnessed the Petitioner hit Kaiwon one time with a closed fist in the head days before he died and that Kaiwon became more and more lethargic thereafter until his collapse. She also witnessed the Petitioner cause the burns to Kaiwon. She also stated that she did not know if the Petitioner had hit Kaiwon at any other time.

49. The Court notes that the Petitioner himself stated to law enforcement in his recorded statement that he regularly punished Kaiwon by hitting him in the back of the head, so the fact that Dawkins noted she had only personally seen the Petitioner hit the child one time is of little consequence looking at the big picture.

50. Based upon the underlying records in the criminal cases and in analyzing counsel's performance under applicable law, the Petitioner fails to demonstrate that trial counsel's performance in not calling Jasmine Dawkins as a witness fell below an objective standard of

reasonableness. Strickland v. Washington, *supra.*; State v. Miller, *supra.*; State ex rel. Kitchen v. Painter, *supra.*

51. Moreover, not calling her as a witness is the sort of decision involving strategy, tactics, and arguable courses of action that should be deemed effectively assistive of the Petitioner's interests unless no reasonably qualified defense attorney would have so acted in his defense. State v. Thomas, *supra.*; State ex rel. Kitchen v. Painter, *supra.*

52. Most certainly other similarly situated defense attorneys would have made the decision not to call Dawkins as a witness considering the damning testimony she offered against the Petitioner when she testified in the course of her own trial.

53. Based upon the above, the Petitioner has failed to demonstrate counsel was ineffective for not calling Jasmine Dawkins as a witness in the Petitioner's trial.

## Jurisdiction

54. The Petitioner's allegation regarding lack of jurisdiction relies on the Petitioner's allegations that there was ineffective assistance of trial counsel. Based upon the Court's rulings above denying the Petitioner relief on said allegations, the Court finds that the trial court had jurisdiction.

## Severance

55. The Petitioner next argues that he was prejudiced by the trial court's granting of co-defendant Dawkins' motion to sever her trial from that of the Petitioner.

56. Upon a review of the record, the Court notes that the Petitioner did not did not object to the Court granting Dawkins' motion to sever trials. As such, he may be found to be barred from asserting it as error. *See* State v. LaRock, 196 W.Va. 294, 315-317, 470 S.E.2d 613, 634-636 (1996).

57.

> If the joinder of defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the State, the Court may sever the defendants' trials, or provide whatever other relief that justice requires.

**W.Va.R.Crim.P.** 14(b).

58. The decision on whether to grant or deny a motion to sever defendants is within the sound discretion of the trial court. *See* State v. Boyd, 238 W. Va. 420, 796 S.E.2d 207 (2017).

59.

> A trial court should grant a severance under Rule 14(b) of the West Virginia Rules of Criminal Procedure only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment

about guilt or innocence.

Syl. Pt. 5, State v. Boyd, 238 W. Va. 420, 796 S.E.2d 207 (2017).

60.

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary...

State v. Boyd, 238 W. Va. 420, 432, 796 S.E.2d 207, 219 (2017), *citing* Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).

61. In this case, Dawkins moved to sever her trial from that of the Petitioner based upon a defense of post-traumatic stress caused by the Petitioner's abuse. Dawkins further desired to testify on her own behalf regarding the Petitioner's abuse and treatment of both her, throughout the history of their relationship including the time period when Kaiwon was in the home, as well as her observations of the Petitioner's treatment of Kaiwon.

62. Under the circumstances of this case, where the Petitioner and Dawkins were the only two adults in the home with a fatally injured child, it is understandable that one co-defendant's defense would be dependent upon inculpating the other, which naturally lead to the motion to sever being filed and ultimately granted by the trial court.

63. The decision to grant or deny a motion to sever is in the sound discretion of the trial court, and the Petitioner makes no showing that there was an abuse of that discretion in this case. State v. Boyd, *supra*.

64. Moreover, the Petitioner's argument that he was unable to compel Dawkins to testify because they were tried separately is unavailing. The Petitioner had no more or less ability to compel Dawkins testimony in his trial whether they were being tried separately or together. Dawkins still would have had the option to assert her Fifth Amendment right to remain silent.

Moreover, if she had chosen to testify, it is clear based upon the above analysis of her testimony in her separate trial, that her testimony would not have been helpful to the Petitioner, and most certainly would not have been exculpatory. In fact, as the Petitioner's trial went, the State did not produce any witness who testified to actually seeing the Petitioner strike the child (although the case was a very strong circumstantial evidence case). It is difficult to understand why the Petitioner feels his case would have been better with the introduction of a witness who actually witnessed the Petitioner strike the child.

65. Based upon the above, the Petitioner fails to demonstrate that the trial court abused its discretion in granting Dawkins' motion to sever and further fails to demonstrate that he was prejudiced by the severance. State v. Boyd, *supra*. As such, the Petitioner is entitled to no relief.

**Prosecutor's Closing Argument**

66. The Petitioner next advances that it was prejudicial for the prosecuting attorney to have advanced argument concerning the size difference between the Petition and co-defendant Dawkins. He indicates that the implication that Dawkins would have been too small or slight to have caused the multiple severe injuries to the child with her hands was improper or "something that the jury should have determined for itself."

67. However, the Petitioner fails to indicate or acknowledge in his Amended Petition that this was argument that the prosecutor advanced in closing based upon evidence that was introduced at trial.

68. The West Virginia Supreme Court holds that:

> The purpose of closing arguments is not only to summarize the evidence, but to afford counsel the opportunity to persuade jurors, within acceptable boundaries, to view the evidence in the light most favorable to their client. Thus, advocates are given great latitude in arguing their cases but are also required to "keep within the evidence and not make statements calculated to inflame the minds of jurors intending to induce verdicts warped by prejudice[.]" State v. Kennedy, 162 W.Va. at 249, 249 S.E.2d at 191 (1978)(*quoting* State v. Lohm, 97 W.Va. 652, 663, 125 S.E.2d 758, 762 (1924)).

Smith v. Andreini, 223 W.Va. 605, 678 S.E.2d 858, 869 (2009).

69. Furthermore, closing arguments are not evidence. *See* Perrine v. E.I. du Pont de Nemours and Co., 225 W.Va. 482, 694 S.E.2d 815 (2010).

70. References in closing arguments to evidence admitted at trial do not constitute error. *See* State v. Gilman, 226 W.Va. 53, 702 S.E.2d 276 (2010).

71. Also, from a review of the underlying record, the jury was specifically instructed that

what the attorneys said in closing arguments was not evidence and the jurors should rely on their own recollection of the testimony and evidence presented in order to arrive at their verdict. [Tr. 3/27/14, pg. 692.]

72. It is clear upon review of the record that the prosecuting attorney was simply arguing that the jurors should consider the size difference between the Petitioner and Dawkins, which was introduced in evidence through testimony consisting of a physical description of Dawkins and the jury's ability to view the Petitioner during trial, in a light favorable to the State's theory of the case. That theory was that the Petitioner was culpable in the death of Kaiwon because he was a perpetrator of the abuse (and/or he was knowingly, willfully, and intentionally allowing the abuse by Dawkins, which would make him just as culpable).

73. The Court notes that Petitioner's trial counsel recognized the that evidence referenced by the prosecutor was introduced in the course of trial, but Petitioner's trial counsel made a compelling argument for why the jury should disregard that argument of the State. [Tr. 3/28/14, pg. 735-736.]

74. Following arguments, the jury was then free to give the evidence the weight it felt it deserved, if any, in deciding the case for itself. However, counsel should not be prevented from arguing an inference in the evidence in support of its case in closing argument.

75. Furthermore,

> 5. A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.
>
> 6. Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. Pts. 5-6, State v. Sugg, 193 W. Va. 388, 456 S.E.2d 469 (1995).

76. There was no prejudice to the accused by the prosecuting attorney's statement in closing argument, as all of her argument referenced matters admitted at trial and properly before the jury.

77. In further review of the factors to be considered, the prosecutor's comment did not mislead the jury, as the Petitioner is larger than Dawkins; the complained of remark was one

sentence in the midst of a 30-minute closing argument by the prosecuting attorney, so it was an isolated reference; the evidence of the Petitioner's guilt, absent the remark, was overwhelming (the Petitioner does not challenge the sufficiency of the evidence and the West Virginia Supreme Court of Appeals has already found the evidence sufficient to sustain the Petitioner's convictions); and the comment was not intended to divert the jury's attention to extraneous matters but merely one factor of many the State urged the jury to consider when determining the Petitioner's culpability based on the evidence of the significance of the child's injuries.

78. Based upon the above, the Petitioner fails to demonstrate the prosecutor's remark made during closing argument to evidence admitted to trial and properly before the jury was in error; furthermore, the Petitioner fails to demonstrate he was clearly prejudiced by the remark to the extent that there was manifest injustice. State v. Gilman, *supra*.; State v. Sugg, *supra*.

**Allegations Regarding Disparate Treatment/Sentencing From Co-Defendant**

79. Because the Petitioner raised the issue of disparate treatment and sentence regarding his co-defendant on appeal, this issue has been previously finally adjudicated. [Memorandum Decision, 11/21/16.] State v. Mauldin, No. 14-1142 (W.Va. Supreme Court, November 15, 2016)(memorandum decision), 2016 WL 6756794.

80. The Petitioner undertakes no discussion of the law in order to demonstrate that the previous decision of the West Virginia Supreme Court of Appeals on this issue was "clearly wrong."

81. Therefore, because this issue has been previously finally adjudicated, the Petitioner is entitled to no relief. **W. Va. Code** § 53-4A-1(b), -3(a), -7(a); State ex rel. Markley v. Coleman, *supra*.; Perdue v. Coiner, *supra*.

82. Furthermore, the Petitioner argues that because Dawkins indicated in the text messages exchanged between the two that she had struck the child (which text messages were introduced at both the trial of Dawkins and the trial of the Petitioner), Dawkins should not have been acquitted on the charge of Death of a Child by a Parent, Guardian, or Custodian by Child Abuse. Furthermore, the Petitioner argues there was no direct evidence to support his conviction of that offense.

83. Neither of the Petitioner's arguments entitle him to relief. As discussed above, despite the introduction of the text messages, Dawkins testified and her trial counsel argued that the Petitioner caused the injuries to the child, and she was too afraid of him to seek help for the child or tell the truth about what happened when the child died. By virtue of the verdict in her case, the jury believed her. Despite the introduction of the text messages, Petitioner's trial counsel argued in his trial that Dawkins caused the injuries to the child unbeknownst to the

Petitioner. By virtue of the verdict in his case, the jury did not believe him.

84.

> Disparate sentences for codefendants are not per se
> unconstitutional. Courts should consider many factors just as each
> co-defendants respective involvement in the criminal transaction
> (including who was the prime mover), prior records, rehabilitative
> potential (including post-arrest conduct, age and maturity), and
> lack of remorse. If codefendants are similarly situated, some
> courts will reverse on disparity of sentence alone.

Syl. Pt. 2, State v. Buck, 178 W.Va. 505, 361 S.E.2d 470 (1987).

85. Because the Petitioner and his co-defendant were found to be not similarly situated with regard to their involvement in the crimes by their respective juries as evidenced by the verdicts issued, the Petitioner is not entitled to relief based upon an argument regarding disparate treatment or sentences.

## Petitioner's Right to Compulsory Process

86. The Petitioner previously raised this allegation in his direct appeal to the West Virginia Supreme Court of Appeals. Therefore, it has been previously adjudicated. [Memorandum Decision, 11/21/16.] State v. Mauldin, No. 14-1142 (W.Va. Supreme Court, November 15, 2016)(memorandum decision), 2016 WL 6756794.

87. The Supreme Court found that since the Petitioner did not issue a subpoena for the appearance of Dawkins at his trial, he was not denied his right to compulsory process as a matter of fact. [Id., pg. 4, fn. 2.]

88. The Petitioner undertakes no discussion of the law in order to demonstrate that the previous decisions of the trial court and West Virginia Supreme Court of Appeals on this issue were "clearly wrong." Therefore, because this issue has been previously finally adjudicated, the Petitioner is entitled to no relief. **W. Va. Code** § 53-4A-1(b), -3(a), -7(a); State ex rel. Markley v. Coleman, *supra.*; Perdue v. Coiner, *supra.*

89. To the extent that the Petitioner argues that his counsel was ineffective for failing to cause a subpoena to issue for Jasmine Dawkins, the Court incorporates by reference its findings and conclusions above and reasserts that the Petitioner is entitled to no relief.

## Allegations of reverse gender discrimination

90. A plain reading of the record in Dawkins' case demonstrates that the State introduced the text messages wherein Dawkins indicated that she had hit the child on numerous occasions and heavily relied on those statements to try to prove Dawkins' guilt.

91. The State cross-examined Dawkins about the text messages that she had sent.

(Dawkins denied sending the text messages despite the circumstantial evidence to the contrary.)

92. The State argued in closing that Dawkins should be convicted of all counts charged due to her admitted participation in the abuse and torture of the child (along with the Petitioner) and her failure to seek medical attention for the child as a result of that abuse and torture.

93. Ultimately, it seems the jury believed Dawkins' testimony and argument and acquitted her of the charge of Death of a Child by a Parent, Guardian or Custodian by Child Abuse.

94. Upon review of the record, the Court finds that the attention that the State had to give Dawkins' claims of spousal abuse was not a product of the State committing any gender discrimination but a product of the active defense set forth by Dawkins in the course of her trial.

95. The Petitioner fails to cite any legal or factual basis under this subheading that would support a grant of relief of any kind. As such, the Petitioner is entitled to no relief.

## Misstatement by West Virginia Supreme Court of Appeals in Petitioner's Memorandum Decision

96. The Petitioner correctly states that he did not testify at his trial.

97. Furthermore, he is correct in pointing out the misstatement contained in the Memorandum Decision that states that he testified in his own defense. [Memorandum Decision, 11/21/16, pg. 2.] State v. Mauldin, No. 14-1142 (W.Va. Supreme Court, November 15, 2016)(memorandum decision), 2016 WL 6756794 at pg. 2.

98. From a review of the underlying records, although the Petitioner did not testify, the Petitioner clearly argued, through counsel at trial and through his own *pro se* appellate brief, that Dawkins was the person who abused Kaiwon causing his death.

99. Moreover, the Petitioner's accounts throughout his argument and brief did contrast markedly with that of Dawkins *at her own trial* where she testified that Mauldin inflicted the beatings and that her fear of Mauldin prevented her from reporting the abuse to authorities.

100. The West Virginia Supreme Court of Appeals did not assert that Dawkins testified at Petitioner's trial. It clearly noted that Dawkins testified *at her own trial* and that the Petitioner's version of events as argued at his trial was not the same as those Dawkins had testified to at her trial.

101. In fact, the West Virginia Supreme Court was quite aware that Dawkins did not testify at the Petitioner's trial because there were allegations of error in that same appeal concerning the Petitioner's right to compulsory process based upon her not having been called as a witness.

102. Furthermore, the Petitioner continues to claim that Dawkins' testimony consisted in

its entirety of her personally witnessing the Petitioner hit Kaiwon on only one occasion. As fully fleshed out above, while Dawkins did testify that she only personally saw the Petitioner hit Kaiwon on one occasion with a closed fist in the head only days before he died, she further testified that the Petitioner caused the burns to Kaiwon, that the Petitioner was emotionally and physically abusive to her, and that she could not say whether the Petitioner ever struck Kaiwon more than the one time she witnessed. However, she further acknowledged it was only she and the Petitioner who had access to Kaiwon in the month preceding his death, and she denied ever abusing the child herself. Looking at her testimony as a whole, Dawkins clearly blamed the Petitioner for inflicting the beatings.

103. The Petitioner further continues to ignore the other overwhelming evidence of his guilt introduced at trial, including his own statements in the form of text messages to Dawkins and in statements he gave to officers, as well as circumstantial evidence related to the severity of the child's injuries, the nature of those injuries as being non-accidental trauma, and the timing of the child's injuries and the Petitioner and Dawkins' exclusive access to the child during that time.

104. The Petitioner also fails to cite any legal or factual basis under this subheading that would support a grant of relief of any kind based upon the misstatement in the Supreme Court's memorandum decision.

105. As such, the Petitioner is entitled to no relief on this claim.

## West Virginia Supreme Court of Appeals' Statement Regarding "Repacking of Rejected Argument"

106. The Petitioner argued, by counsel, throughout his trial and argued, both by counsel and in his *pro se* brief, throughout the direct appeal that it was Dawkins who committed the abuse against Kaiwon that lead to his death and not the Petitioner.

107. In the Memorandum Decision released by the West Virginia Supreme Court of Appeals, the Court notes in addressing the Petitioner's arguments that Dawkins should have been convicted of the charge of Child Abuse by a Parent, Guardian or Custodian and the Petitioner should have been acquitted thereof, that "to the extent that Mauldin asserts that Dawkins was similarly culpable or more so than he, it is simply a repackaging of his rejected argument that Dawkins was the person responsible for affirmatively causing K.C.'s death." [Memorandum Decision, 11/21/16, pg. 4, fn. 2.] State v. Mauldin, No. 14-1142 (W.Va. Supreme Court, November 15, 2016)(memorandum decision), 2016 WL 6756794 at pg. 4, fn. 2.

108. The Supreme Court correctly cites that the Petitioner's argument at trial that Dawkins was the culpable party was rejected by the jury and similarly rejected by that Court in finding that

the Petitioner was not entitled to relief.

109. There is no error in this statement or finding of the Supreme Court. As such, the Petitioner is entitled to no relief thereon.

## Waived Grounds

110. The Petitioner is not entitled to relief on any of the following grounds that he expressly waived on his signed, and verified Losh list:

- Statute under which conviction obtained is unconstitutional
- Indictment shows on its face that no offense was committed
- Denial of right to a speedy trial
- Involuntary guilty plea
- Mental competency at the time of the crime
- Unintelligent waiver of counsel
- Consecutive sentences for same transaction
- Coerced confessions
- Falsification of a transcript by Prosecutor
- Unfulfilled plea bargains
- Information in pre-sentence report erroneous
- Double jeopardy
- Irregularities in arrest
- Excessiveness or denial of bail
- No preliminary hearing
- Illegal detention prior to arraignment
- Irregularities or errors in arraignment
- Defects in indictment
- Improper venue
- Refusal of continuance
- Refusal to subpoena witnesses
- Prejudicial joinder of defendants
- Lack of full public hearing
- Refusal to turn over witness notes after witness has testified
- Claim of incompetence at time of offense as opposed to time of trial
- Claims concerning use of informers to convict

- Instructions to the jury
- Claims of prejudicial statements by trial judges
- Sufficiency of evidence
- Improper communications between prosecutor or witnesses and jury
- Question of actual guilt upon an acceptable guilty plea
- Severer sentence than expected
- Excessive sentence
- Mistaken advice of counsel as to parole or probation eligibility
- Amount of time served on sentence, credit for time served

[Losh List.] Losh v. McKenzie, *supra*.

## Unwaived but Unsupported Grounds

111. The Petitioner offers no factual or legal basis in support of the following allegations, which are not initialed as waived on his Losh list:

- Prejudicial pre-trial publicity
- Mental competency at the time of the trial cognizable even if not asserted at proper time or if resolution not adequate
- Incapacity to stand trial due to drug use
- Language barrier to understanding the proceedings
- Failure of counsel to take an appeal
- Suppression of helpful evidence by prosecutor
- State's knowing use of perjured testimony
- Challenges to the composition of grand jury or its procedures
- Failure to provide copy of indictment to defendant
- Pre-indictment delay
- Non-disclosure of Grand Jury minutes
- Defendant's absence from part of proceedings
- Amount of time served on sentence, credit for time served

112. As noted above, specificity is required in habeas proceedings. **W.Va. Code §53-4A-2.**

113. "'A mere recitation of any of our enumerated grounds without detailed factual support does not justify the issuance of a writ, the appointment of counsel, and the holding of a hearing.' Losh [v. McKenzie, *supra*]." State ex rel. Markley v. Coleman, *supra*.

114. Because the Petitioner fails to recite with specificity any basis in fact or in law that would entitle him to relief on any of the above enumerated non-waived grounds in paragraph 111, the Petitioner is not entitled to relief thereon. **W.Va. Code** §53-4A-2.

## Conclusion

For each of the reasons detailed above, the Petitioner fails to allege any grounds in this habeas corpus proceeding upon which relief may be granted. No evidentiary hearing is required for the Court to make its findings and conclusions because all of the matters alleged can readily be determined by reference to the records in State v. Jasmine K. Dawkins, Case No. 12-F-132 and State v. James N. Mauldin; Case No.: 12-F-135 and review of applicable law. **ACCORDINGLY**, the Amended Petition for Writ of Habeas Corpus is **DENIED**. The objection of the Petitioner is noted.

The Clerk shall enter this order and transmit copies to all counsel of record. The Clerk shall further remove this case from the active docket of the Court and place it among matters ended.

**/s/ Bridget Cohee**
Circuit Court Judge
23rd Judicial Circuit

Note: The electronic signature on this order can be verified using the reference code that appears in the upper-left corner of the first page. Visit www.courtswv.gov/e-file/ for more details.